**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**CITY OF ALBUQUERQUE,**

      **Plaintiff,**

**v.**                             **No.**

**WILLIAM P. BARR,**
**In his official capacity as Attorney**
**General of the United States, and**
**the UNITED STATES DEPARTMENT**
**OF JUSTICE,**

      **Defendants.**

### VERIFIED PETITION FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND A WRIT OF MANDAMUS

### INTRODUCTION

1.      In our system of government, local governments are the primary actors responsible for ensuring the safety of communities through law enforcement policies that promote trust between law enforcement agencies and the residents they serve. In the City of Albuquerque, fostering trust between the Albuquerque Police Department and its large and diverse immigrant community is a critical factor in keeping the City safe. The Edward Byrne Memorial Assistance Grant ("Byrne JAG") Program provides funding for states and local government units to support a broad range of criminal justice related activities based on their own local needs and conditions. 34 U.S.C. § 10151 *et seq*. Congress intends the Byrne JAG Program funding to be used to: support law enforcement programs and provide funding for law enforcement equipment; fund prosecution and court programs; support education and crime prevention programs; address certain types of crime; and more. 34 U.S.C. §§ 10152, 10157(b)(1).

2. Contrary to this congressional intent, however, since the Trump Administration took office, the United States Department of Justice ("DOJ") repeatedly and unlawfully has attempted to coerce local governments into enforcing the federal government's civil immigration priorities by conditioning Byrne JAG Program funding on compliance with immigration-related conditions that have nothing to do with the Program's purpose. Plaintiff, the City of Albuquerque, challenges these unconstitutional and illegal conditions as they are imposed on the Crime Gun Intelligence Center Integration Initiative FY 2018 Grant ("CGIC Grant"), a grant authorized by the Byrne JAG Program and awarded to the City in 2018. The City seeks declaratory and injunctive relief to protect its ability to pursue its own law enforcement prerogatives in the manner that best achieves the safety and security of its communities and to stop the DOJ's aggressive and escalating effort to force cities into becoming the deportation arm of the federal government. The City further seeks a Writ of Mandamus to the Department of Justice to disburse the funds pursuant to the CGIC grant.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question); 28 U.S.C. § 2201(a) (Declaratory Judgment Act); 28 U.S.C. § 1361 (writ of mandamus); and 5 U.S.C. §§ 701 *et seq.*--706 (Administrative Procedure Act).

4. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1) because substantial events giving rise to this action occurred and continue to occur within the District of New Mexico.

## PARTIES

5. Plaintiff, the City of Albuquerque (sometimes hereafter "the City"), is a municipal corporation duly organized and existing under the laws of the State of New Mexico.

2

6.     The City is a member of the Conference of Mayors.[1]

7.     The City does not own or operate a jail, correctional facility, or detention facility.

8.     Defendant William P. Barr is the Attorney General of the United States and is the federal official in charge of the United States DOJ. Pursuant to 34 U.S.C. § 10152(a)(1), the Attorney General is charged by Congress with administering the Byrne JAG Program. The City sues Defendant Barr in his official capacity.

9.     Defendant, the United States DOJ, is an agency of the United States government. Through the DOJ, the Attorney General administers the Local Law Enforcement Crime Gun Intelligence Center Integration Initiative ("CGIC"), a grant administered under the Byrne JAG Program, through the DOJ Office of Justice Programs ("OJP").

## GENERAL ALLEGATIONS

## ALBUQUERQUE IS AN IMMIGRANT FRIENDLY CITY

10.    Since 2000, Albuquerque has identified itself as an Immigrant-Friendly City and a Welcoming City.

11.    In identifying itself as an Immigrant-Friendly City, the City Council repeatedly made considered policy decisions, based on evidence and knowledge of the history of Albuquerque, the Constitution, and the needs of its population.

---

[1] The United States Conference of Mayors, founded in 1932, is a non-profit, non-partisan association of United States cities with populations of 30,000 or more. It represents the interests of over 1,400 cities and their more than 150 million residents. Among the Conference of Mayors' primary roles are safeguarding the interests of municipalities and ensuring that federal policy meets urban needs.
The Conference of Mayors adopted policy resolutions in 2017 and 2018 addressing the federal government's effort to force localities to engage in federal civil immigration enforcement. The resolutions called for: (a) an end to unconstitutional funding threats to cities in an effort to coerce and compel them into implementing federal immigration law; (b) the end of the DOJ's unconstitutionally broad interpretation of 8 U.S.C. §1373; and (c) the award of Byrne JAG funds to municipalities without the imposition of unconstitutional conditions.

12.     In 2000, the Albuquerque City Council passed a Resolution, R-2001-009, "Declaring The City Of Albuquerque An Immigrant-Friendly City; Establishing City Of Albuquerque Policies Regarding Immigrants And Their Families, Regardless Of Immigration Status; Establishing A City Of Albuquerque Immigrant Resource Program; And Providing An Appropriation." [Exhibit A]

13.     Resolution R-2001-009 recognizes, *inter alia*, that "thousands of immigrants and their families have lived and worked in the Albuquerque metropolitan area for many years;" and that "immigrants from throughout the world contribute to Albuquerque's cultural richness and economic prosperity, through their labor and initiative, payment of taxes, and other economic and cultural activities." [Exhibit A]

14.     Resolution R-2001-009 established the policy that "[t]o the fullest extent allowed by federal and state law, immigrants who live within the city limits of Albuquerque and their families shall have access to all City services and programs." [Exhibit A]

15.     Resolution R-2001-009 further established the policy that "[t]he City shall not discriminate on the basis of a person's national origin and will treat all persons with respect and dignity, regardless of immigration status." [Exhibit A]

16.     Resolution R-2001-009 also established the policy that "[n]o municipal resources shall be used to identify individuals' immigration status or apprehend persons on the sole basis of immigration status, unless otherwise required by law to do so." [Exhibit A]

17.     Subsequently, the City of Albuquerque's Police Department ("APD"), revised its Standard Operating Procedure, then designated as SOP 2-14-4, now designated as 2-80-2(F)(3), regarding "Undocumented Foreign Nationals (Undocumented Immigrants)." In doing so, APD, as a local police department, determined that the enforcement of federal immigration law is the

responsibility of federal law enforcement officers, and adopted a policy not to enforce federal immigration law.

18.     APD revised SOP 2-80-2(F)(3), in part, to resolve litigation in the case of *Gonzalez v. City of Albuquerque*, No. 1:05-cv-00580-JB-WPL, Doc. 234-2 (D.N.M. August 15, 2007).

19.     SOP 2-80-2(F)(3) states:

Undocumented Foreign Nationals (Undocumented Immigrants)

a. The enforcement of immigration laws and the arrest of undocumented foreign nationals reside exclusively with the federal government.
b. Officers shall not stop, question, detain or arrest any person solely on the ground that they may be undocumented and deportable foreign nationals.
c. Officers shall not inquire about or seek proof of a person's immigration status, unless the person is in custody or is a suspect in a criminal investigation for a non-immigration criminal violation and the immigration status of the person or suspect is pertinent to the criminal investigation.
d. Officers shall not call federal immigration officials to the scene of a stop or investigation, except in the case of suspected human trafficking. The following procedures apply to a case of suspected human trafficking:
       i. Officers shall obtain supervisor approval before contacting federal immigration officials; and
       ii. Officers shall document the investigation in an offense/incident report.
e. Officers do not have the authority to place an "ICE" hold on individuals suspected of having violated federal immigration laws.
f. Officers shall not request assistance in language translation from any immigration official or agency.
g. Officers shall accept the Mexican Consular Identification Card (Matricula Consular de Alta Seguridad) as a valid form of identification. The Mexican Consular Identification Card is not an indication of a person's immigration status, nor is it sufficient evidence to establish reasonable suspicion of a person's immigration status.
h. All children have a right to attend public schools in the United States. Officers shall not, under any circumstances, engage in stopping, questioning, detaining, investigating or arresting minor children (under 18 years old) on any immigration related matter while on or immediately in the vicinity of public school grounds or property. Officers are also prohibited from assisting others, including school personnel or other law enforcement officers or agencies, in detaining or questioning minor children on any immigration-related matter.
i. Nothing in this SOP shall prevent an officer from investigating any city, state or federal non-immigration criminal violation or taking any action necessary for officer safety.

[Exhibit B]

20.     In 2017, the Council of the City of Albuquerque passed a Memorial, M-2017-001,

"Reaffirming the City of Albuquerque's Commitment to Diversity and Immigrant Friendly

Status, and to Safeguarding the Civil Rights, Safety and Dignity of All Our Residents, Whether

They be Immigrants, War Refugees, People of Color, Muslims, Jews, LGBTQ People, or People

With Disabilities." [Exhibit C]

21.     Memorial M-2017-001 identifies the unique qualities of Albuquerque that contributed to

the decision of the Council to adopt M-2017-001, including that:

> The City of Albuquerque is made up of diverse individuals, both native born and
> immigrants, whose collective cultures, religions, backgrounds, orientations,
> abilities and viewpoints join to form a highly pluralistic community which prides
> itself on being a place which welcomes persons and families of all walks of life.

[Exhibit C]

22.     Similarly, Memorial, M-2017-001 recognizes that:

> The City of Albuquerque has a strong tradition and mission of embracing and
> valuing diversity and the City Council believes that it is similarly important to
> support diversity and to provide services to all persons in the City regardless of
> their race, disability, national origin, gender identity, religion, sex, sexual
> orientation, ethnicity, economic or immigration status (in addition to any other
> protected classes under local, state, or federal law).

[Exhibit C]

23.     On April 16, 2018, the Albuquerque City Council adopted a Resolution strengthening

Albuquerque's status as an immigrant-friendly City. In that Resolution, R-2018-018, the City

Council stated, *inter alia*, that it was reaffirming its commitment to R-2001-009 and M-2017-

001. [Exhibit D] The City Council also recognized and reaffirmed the City's rights under the

Tenth Amendment, stating in pertinent part that "the Tenth Amendment of the Constitution of

the United States recognizes the sovereign status of the states and their political subdivisions and

precludes the federal government from attempting to compel state and local governments, either directly or by their use of threats to withhold federal funding, to assist the federal government in enforcing federal laws, including immigration laws."

24. Resolution R-2018-018 further relied on studies demonstrating: (1) the positive impact that immigrants have on the federal, state, and local economy, including starting businesses, participating in the state workforce, and undocumented immigrants paying $101.5 million in state and local taxes; (2) evidence that immigrants commit fewer crimes than native born Americans; and (3) evidence that the vast majority of children in New Mexico with one or more immigrant parent are United States citizens. [Exhibit D]

25. In Resolution R-2018-018, the City Council concluded that "the involvement of local government in enforcement of federal civil immigration laws would undermine community policing, hinder a productive and trusting relationship with the immigrant community, and divert important public safety resources." [Exhibit D]

26. The City Council further acknowledged that "the mission of the Albuquerque Police Department is to protect the safety of the public against crimes committed by persons whoever they may be." R-2018-018. [Exhibit D]

27. The City Council stated that "the City wishes to foster trust and cooperation between the City, its police department, and its immigrant communities, and wishes to encourage immigrants to report crime and speak to the police without fear of being arrested or reported to the United States Immigration and Customs Enforcement agency." R-2018-018. The City Council cited a study finding that "immigration enforcement efforts have had a chilling impact on immigrant survivors of domestic violence and sexual assault," and that immigrant survivors express concern with contacting the police or going to court to participate in civil and criminal cases. [Exhibit D]

28.     The City Council determined that "the City should not adopt policies that may violate its residents['] constitutional rights under the Fourth Amendment such as 'immigration detainers,' and that exceed the government's limited warrantless arrest authority under federal law, exposing the City to civil rights violations." [Exhibit D]

29.     Resolution R-2018-018 forbids the City from "collecting or storing" immigration status information *unless otherwise required by law*, and further states that "the City shall not disclose information that the City currently possesses regarding place of birth, religion, or national origin . . . absent a valid judicial warrant for such information *or as otherwise required by law*." [Exhibit D (Emphasis added)]. This resolution was tailored to assure that, to the extent valid and applicable state or federal law required the collection, storage, or disclosure of information, the City would be in compliance with such law.

30.     Resolution R-2018-018 further states:

> 3.  The City shall not use any City resources, including but not limited to moneys, equipment, personnel, or City facilities, nor permit any City facility to be used for the enforcement or to assist in the enforcement of federal immigration law by any of the following:
> a.   Detecting, apprehending, identifying, investigating, arresting, detaining, or continuing to detain a person based on the individual's immigration status or the belief that the person has committed a violation of immigration law;
> b.  Arresting, detaining or continuing to detain a person in response to, or honoring in any other way, any immigration detainer, or federal administrative warrant that is based solely on a violation of federal immigration law; or
> c.   Enforcing any federal program requiring the registration of individuals on the basis of religious affiliation or ethnic or national origin.

[Exhibit D]

Resolution R-2018-018 requires the City to: "refuse access to all city-operated, non-public areas of City property (including but not limited to the Prisoner Transport Center) by federal immigration agents who are requesting access for the purpose of enforcing federal immigration

law unless presented with a judicial warrant issued specifically requiring such access." [Exhibit D]

**THE BYRNE JAG PROGRAM**

31.     The Byrne JAG Program has its origins in the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, Title I, 82 Stat. 197, which created the first block grants for states and localities to use for law enforcement and criminal justice programs.[2] Recognizing that "crime is essentially a local problem that must be dealt with by State and local governments," 82 Stat. at 197, Congress designed the grant to provide a reliable funding stream that states and localities could use in accordance with state and local law enforcement policies and priorities.

32.     To ensure federal deference to local priorities, the 1968 Act prohibited federal agencies and executive branch officials from using law enforcement grants to "exercise any direction, supervision, or control over any police force or any other law enforcement agency of any State or any political subdivision thereof." *Id.* § 518(a), 82 Stat. at 208.

33.     Although Congress has repeatedly modified the structure and terms of the law enforcement grants authorized under Title I of the 1968 Act, the prohibition originally set forth in § 518 of the 1968 Act remains in effect with virtually no modification and is now codified in the same chapter of the U.S. Code as Byrne JAG. *See* 34 U.S.C. § 10228(a). The full text of Section 10228(a) provides: "Nothing in this chapter *or any other Act* shall be construed to

---

[2] *See* Justice System Improvement Act of 1979, Pub. L. No. 96-157, 93 Stat. 1167, 1179 (amending Title I of the 1968 Act and reauthorizing law enforcement block grants to states and local governments); Justice Assistance Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, 2077-85 (same); Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, pt. E, 102 Stat. 4181, 4329 (amending Title I of the 1968 Act and creating a formula law-enforcement grant); Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006) (amending Title I of the 1968 Act and creating the modern Byrne JAG Program).

authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." *Id.* (Emphasis added).

34.     For nearly fifty years, the states and local governments have used grant funds received under the Byrne JAG Program and its predecessor grant programs to support a broad array of critical law enforcement programs tailored to local needs.

35.     Congress codified the modern Byrne JAG Program in 2006. For over a decade, the DOJ administered the Byrne JAG Program as Congress intended: funding critical law enforcement initiatives without seeking to leverage funding to conscript local governments to enforce federal immigration law.

36.     The modern Byrne JAG Program is designed to "give state and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). Albuquerque has used Byrne JAG funds to support a diverse array of programs tailored to local law enforcement needs.

37.     While most funding provided by Congress to fund the Byrne JAG Program is distributed to states and local jurisdictions pursuant solely to a formula, 34 U.S.C. § 10156, the Attorney General may reserve up to five (5) percent of the funds appropriated each fiscal year to the Program for grants, "to be granted to 1 or more States or units of local government, for 1 or more of the purposes specified in section 10152 of this title, pursuant to his determination that the same is necessary – (1) to combat, address, or otherwise respond to precipitous or extraordinary increases in crime, or in a type or types of crime."  34 U.S.C. § 10157(b)(1).

38.     The CGIC grant is a is one of these specific purpose, limited competition Byrne JAG

Program grants arising under 34 U.S.C. § 10157(b)(1).  The CGIC grant provides funding to

address illegal firearm-related crime and forensics.

39.     The intent of the CGIC program is to assist state, local, and tribal law enforcement in

responding to violent gun-related crime.

40.     According to the DOJ's Grant Manager's Memorandum, Pt. 1, Project Summary, 15,

funding is provided to entities that are experiencing "precipitous increases in gun crime" in order

to encourage them "to work with their ATF partners to utilize intelligence, technology, and

community engagement to swiftly identify firearms unlawfully used and their sources, and

effectively prosecute perpetrators engaged in violent crime." [Exhibit H, p. 22 (attachment)].

**THE CITY'S CGIC APPLICATION, REQUEST FOR REMOVAL OF THE
IMMIGRATION CONDITIONS, AND BASES FOR THAT REQUEST**

41.     On March 22, 2018, the DOJ published a grant solicitation for "BJA FY 18 Local Law

Enforcement Crime Gun Intelligence Center Integration Initiative," i.e., the CGIC grant

solicitation. [Exhibit E]

42.     APD applied for the fiscal year ("FY") 2018 CGIC grant on May 7, 2018.

43.     As set forth in its Project Abstract, APD applied for the grant in order to "enhance its

responses to gun crimes not only in Albuquerque, but in the metro area as well." [Exhibit F].

APD planned to use the funds to expand its program of cooperation with the Bureau of Alcohol

Tobacco and Firearms and the United States Attorney's Office through the National Integrated

Ballistic Network (NIBIN) program by adding, *inter alia*, all guns into the program within 24-48

hours of collection.  In addition, APD would add an electronic gunshot detection system, partner

with the University of New Mexico School of Public Administration for data analytics to

determine the location of the electronic gunshot detection system, and work with community partners to reduce gun violence and the neighborhood level. [Exhibit F]

44.     Further, as set forth in the Program Narrative submitted with the grant application, a training program would be developed and offered to officers, investigators, and prosecutors.  In addition, staff would be hired:

> If funded, APD will hire several dedicated staff to support effective investigations and prosecution of violent crimes involving a firearm. A full-time [City of Albuquerque] CGIC Project Coordinator will be hired whom will be responsible for the day-to-day operations of the project and ensure all grant requirements are being met.  Additional duties will entail working with the partners to conduct trainings to enhance gun and gun violence prosecutions and community awareness regarding gun prevention.

Further, two analysts would be provided to APD's Special Investigations Division to support investigations and one to the Second Judicial District Attorney's office to support prosecutions arising from the CGIC. [Exhibit G]

45.     On October 1, 2018, APD Police Chief Michael J. Geier received a letter from a Deputy Assistant Attorney General stating that the City's application for funding for FY 2018 had been approved in the amount of $452,108.00. [Exhibit H]

46.     Included in the special conditions for acceptance of the CGIC grant were new, immigration-related conditions, specifically, conditions 49, 50 and 51, which had not been identified in the solicitation for the CGIC Grant. [Exhibit H] These conditions are sometimes hereafter referred to as the "Immigration Conditions" and the "Challenged Conditions."

47.     The letter informing APD that it was awarded the CGIC Grant stated that the APD's award was "subject to all administrative and financial requirements. . . . Should you not adhere to these requirements, you will be in violation of the terms of this agreement and the award will be subject to termination for cause or other administrative action as appropriate."  The Grant

documents further provide that the conditions of the award "are material requirements of the award." [Exhibit H]

48.     Among the Immigration Conditions is condition 49, which prohibits the City and its officials from restricting communication to or from a government agency regarding immigration status as described in 8 U.S.C. § 1373(a), 1373(b) or 8 U.S.C. § 1644. This condition is hereinafter referred to as the "Compliance Condition." [Exhibit H]

49.     Also among the Immigration Conditions is condition 50, which makes APD's ability to obligate award funds contingent upon its non-interference with 8 U.S.C. § 1373 and 8 U.S.C. § 1644, and that the program is not subject to any "information-communication restriction." Condition 50 further makes any drawdown of funds a material representation by the City that it is in compliance with this condition, and requires the City to notify OJP in writing if, from its monitoring, it obtains credible evidence that it may be subject to any information-communication restriction. This condition is hereinafter referred to herein as the "Non-obligation Condition." [Exhibit H]

50.     Finally, among the Immigration Conditions is condition 51, which prohibits public disclosure "of any federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice under 18 U.S.C. ch. 12—without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. 1071 or 1072 or of 18 U.S.C. 1324(a)." Condition 51 is hereinafter referred to as the "Harboring Condition." [Exhibit H]

51.     The "rules of construction" of condition 51 incorporate by reference the terms of both 8 U.S.C. §1373 and §1644 as if set forth in full. [Exhibit H] Incorporation of these statutes and the

use of the vague and undefined term "harbor" render this condition ambiguous, leaving the City without the ability to determine if it is in compliance with the condition.

52.     Defendants' decision to impose these sweeping Immigration Conditions on CGIC grantees represents an unlawful, *ultra vires* attempt to force the grantees, including APD, to forsake its own policy judgments and aid in federal civil immigration enforcement. Nothing in the Byrne JAG Program statute "grant[s] the Attorney General the authority to impose conditions that require states or local governments to assist in immigration enforcement, nor to deny funds to states or local governments for their failure to comply with those conditions." *City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018).

53.     Chief Geier accepted the award on November 15, 2018, however, he struck special conditions 49, 50, and 51, the Immigration Conditions, from the award. [Exhibit I]

54.     On November 15, 2018, along with the accepted grant document, Esteban A. Aguilar, Jr., the City Attorney for the City of Albuquerque, sent a letter to Michael L. Alston, Director, Bureau of Justice Assistance, Office of Justice Programs at DOJ stating, *inter alia*, that the City did not agree to special conditions 49, 50, and 51, objected to those conditions, and requested grant adjustments to remove those conditions. [Exhibit J]

55.     In his letter, Mr. Aguilar stated, *inter alia*, that the City remained committed to supporting its crime reduction program, including through the CGIC grant.  He further stated that the City had "concluded that the unfunded involvement of local government in the enforcement of federal civil immigration laws undermines a productive and trusting relationship with the immigrant community and hinders local law enforcement and community safety," and that the City:

> considers its immigrant residents to be incredibly important resources in reporting, solving, and preventing crimes, and wants to ensure that its immigrant

population feels safe to communicate to law enforcement any concern it may have. In short, like many other cities, the City has concluded that building trust with its immigrant population is necessary for effective policing, and has enacted policies reflecting this carefully considered conclusion.

[Exhibit J]

56.     The City Attorney's letter of November 15, 2018 referenced, *inter alia*, *City of Evanston v. Sessions*, 18-C-4853, Doc 23, (N.D. Ill. August 9, 2018) (granting a preliminary injunction against imposition of the same immigration conditions on the FY 2017 Byrne JAG grants for members of the Conference of Mayors)[3] Doc. 33, (Order of the Seventh Circuit lifting the stay of the preliminary injunction), and reminded the DOJ that the City is a member of the Conference of Mayors and so a beneficiary of the injunction.  [Exhibit J]

57.     In the Court's August 9, 2018 order in *City of Evanston*, the U.S. District Court for the Northern District of Illinois had addressed similar challenged Immigration Conditions in a declaratory judgment action, entering summary judgment for the Plaintiffs based upon the Court's conclusions that 8 U.S.C. § 1373 was unconstitutional, that these specific conditions violated the Tenth Amendment, and were *ultra vires*.[4]

---

[3]   In the following year, the U.S. District Court for the District of Illinois issued a permanent injunction barring the DOJ from imposing any of the challenged conditions on Byrne JAG funds received by members of the Conference of Mayors in *City of Evanston v. Barr*, No. 18-C-4853, 2019 WL 4694734 (N.D. Ill. Sept. 26, 2019), finding that the U.S. Attorney general lacked the statutory authority to impose said conditions.  However, despite this ruling, the DOJ has not informed the City that it will not impose the same challenged conditions on the CGIC grant.

[4] Rather than respecting the court's determination, the DOJ doubled down by placing reworded conditions, largely indistinguishable from those found unconstitutional and *ultra vires* with respect to the 2017 Byrne JAG funds in the applications for the 2018 Byrne JAG Program, and added additional unconstitutional and otherwise objectionable conditions. As a result, the Conference of Mayors and City of Evanston filed an Amended Complaint on December 10, 2018, Doc. No. 692, challenging the new and reworded conditions.

58.     The City Attorney's letter also reminded the DOJ of *Murphy v. National Collegiate Athletic Association*, 138 S.Ct. 1461 (2018), in which the Supreme Court held that both compelling a state to enact legislation and prohibiting a state from enacting legislation violate the Tenth Amendment.  [Exhibit J]

59.     The City has attempted repeatedly to engage with the DOJ to revise the CGIC grant's requirements since the City accepted the award.

60.     On December 17, 2018, the City's CGIC grant manager at DOJ, Joseph Husted, sent an email to the City notifying the City that "the award acceptance for 2018-DG-BX-0009 [the CGIC grant] will have to be resubmitted without any conditions marked out." [Exhibit K]

61.     The City thereafter sent a letter to Tracy Trautman, Deputy Director for the Bureau of Justice Assistance, asking, "Will the Department of Justice agree not to enforce conditions 49, 50, and 51 of the CGIC Grant to the Albuquerque Police Department unless and until a court rules that the Department of Justice can lawfully enforce these conditions?" [Exhibit L]

62.     The federal government did not respond during the period of the government shutdown.

63.     After the federal government resumed operations, the City again asked Deputy Director Trautman whether the DOJ would "agree not to enforce [the immigration related conditions] of the CGIC Grant to the Albuquerque Police Department unless and until a court of law rules that the Department of Justice can lawfully enforce these conditions?" [Exhibit M]

64.     Deputy Director Trautman responded:

> Thank you for your letter, which refers to the injunction entered by the U.S. District Court for the Northern District of Illinois in *City of Evanston v. Sessions*. By its terms (as applicable to the City of Albuquerque, as a member of the U.S. Conference of Mayors), the injunction forbids the Department of Justice from enforcing certain specific conditions that are attached to the Fiscal Year 2017 Byrne JAG award to the City of Albuquerque.

> We are unaware of any judicial order that enjoins the Department from enforcing any award condition in the Crime Gun Intelligence Center (CGIC) award to the City of Albuquerque; accordingly, the City should understand that all the award conditions set out therein are equally part of, and fully applicable to, that award.

[Exhibit N]

65.     Defendants are forcing the City of Albuquerque, and all grantees, into an untenable position: accept unlawful and unconstitutional conditions that diminish the ability to design law enforcement policies to protect their own unique communities or forfeit Byrne JAG CGIC funding, thereby sacrificing sovereignty and residents' safety by permitting Defendants to undermine the vital programs that such funding supports. Defendants cannot force the City to choose between its right to exercise municipal sovereignty and its right to receive grants funds allocated to it by Congress.

66.     Section 1373(a) and (b) of Title 8 of the United States Code, referenced by the Immigration Conditions, provides in pertinent part:

> (a) In General. Notwithstanding any other provision of Federal, State or local law, a Federal, State or local government entity or official may not prohibit, or in any way restrict, any government entity or official from *sending to, or receiving from*, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.
> (b) Additional Authority of Governmental Entities. Notwithstanding any other provision of Federal, State or local law, *no person or agency* may prohibit, or in any way restrict, a Federal, State or local governmental entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:
>
>      (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
>
>      (2) Maintaining such information.
>
>      (3) Exchanging such information with any other Federal, State, or local government entity.
>
> (Emphasis added).

67.     All but one of the federal courts that have addressed the use of 8 U.S.C. § 1373 as a basis

for imposition of immigration-related conditions on Byrne JAG Program funds have found 8

U.S.C. § 1373 to be unconstitutional. *See, e.g.*, *City of Philadelphia v. Attorney General of the*

*United States*, 916 F.3d 276 (3d Cir. Feb. 15, 2019) (holding "the Attorney General exceeded his

statutory authority in promulgating the Challenged Conditions" imposed on the 2017 Byrne JAG

Program funds), *aff'g in part and vacating in part sub nom City of Philadelphia v. Sessions*, 309

F.Supp.3d 289, 321, 329-31 (E.D. Pa. 2018) (holding that § 1373 violates the separation of

powers and the Tenth Amendment); *City of Chicago v. Sessions*, 888 F.3d 272, 287 (7th Cir.

2018)[5] (agreeing with the district court's conclusion that Chicago was likely to succeed on the

merits because the Attorney General lacked the authority to impose the challenged conditions

and affirming the injunction); *State of Oregon v. Trump*, 406 F.Supp.3d 940 (D. Or. 2019)

(concluding that both § 1373 and § 1644 violated the Tenth Amendment, that Defendants

otherwise lacked the authority to withhold grant funds, and granting partial summary judgment

and a permanent injunction to Oregon, its Governor, Oregon's Attorney General and the City of

Portland); *City of Los Angeles v. Sessions*, 2019 WL 1957966 (C.D. Cal. February 15, 2019)

(holding that the immigration related conditions imposed on the 2018 Byrne JAG Program funds

are *ultra vires* action by the Attorney General and violate the separation of powers doctrine and

---

[5] While the appellate case in *Chicago v. Sessions* has a convoluted history, the decision of the
panel as to the likelihood of Chicago's success on the merits has not been vacated. After the
panel's decision, the Court granted *en banc* review solely as to the geographic scope of the
preliminary injunction, and vacated the panel's decision "insofar as it sustained the district
court's decision to extend preliminary relief nationwide." *Chicago v. Sessions*, 2018 WL
4268817, *1 (7th Cir. 2018). Subsequently, the Court *en banc* vacated its "decision to rehear
[the panel decision] *en banc*" as procedurally moot given the that the Court entered a permanent
injunction and the "preliminary injunction has all but evaporated." *Id.*, 2018 WL 4268814, *2
(*en banc*) (7th Cir. 2018).

granting a program-wide, nationwide injunction barring the Attorney General from imposing the conditions); *San Francisco v. Sessions*, 349 F.Supp.3d 924 (N.D. Cal. Oct. 5, 2018) (holding that imposing Section 1373 on state and local governments "inevitably reache[d] the state's relationship with its own … undocumented immigrant communities in ways that no doubt will affect their perceptions of the state and trust in its law enforcement agencies" in violation of the Tenth Amendment); *see also City of Chicago v. Barr*, 405 F.Supp.3d 748 (N.D. Ill. 2019) (reaching the same conclusion and granting a permanent injunction on the imposition of the conditions on the 2017 and 2018 Byrne JAG awards).[6]

68.     The recent Second Circuit decision, *inter alia*, viewed federal immigration policy as overriding other state and federal policies and interests and, in that context, addressed the issues presented as ones of statutory construction, while ignoring that Congress repeatedly declined to amend the Byrne JAG statute to require compliance with federal immigration law. *New York v. United States Dep't of Justice*, No. 19-267, 2020 WL 911417, **9-18 (Feb. 26, 2020).  The more recent case of *City of Providence v. Barr*, however, rejected the Second Circuit's analysis and agreed with all of the other courts that have thus far concluded that "Congress did not make an allowance for any deviation [from the Byrne JAG statutory formula for funding] that would justify the actions undertaken by the DOJ in this case." *City of Providence v. Barr*, No. 19-1802, 2020 WL 1429579, *8 (1st Cir. Mar. 24, 2020); *see also Chicago*, 888 F.3d at 277-78 (reviewing the legislative history rejecting several attempts to condition federal funding on compliance with 8 U.S.C. § 1373).

---

[6] The sole exception is the Second Circuit, in *States of New York et al v. United States Department of Justice et al*, No. 19-267 (Feb 26, 2020), reversing *States of New York v. Department of Justice*, 343 F.Supp.3d 213 (S.D.N.Y. 2018).

69.     The City's policies comply with Sections 1373 and 1644, when those statutes are properly and narrowly interpreted, and, to the extent these policies are the basis for Defendants' refusal to provide the City with access to the funds it has awarded the City for the CGIC grant, Defendants are imposing an unduly broad interpretation of that section through their challenged conditions.

70.     8 U.S.C. § 1644, which is part of the 1996 Welfare Reform Act, is textually unconnected to the Byrne JAG Program. It contains no limit on the use of federal funds. It prohibits the same conduct as Section 1373, stating:

> Notwithstanding any other provision of Federal, State, or local law, no State or local government may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service[7] information regarding the immigration status, lawful or unlawful, of an alien in the United States.

*City of New York v. United States*, 179 F.3d 29 (2d. Cir. 1999), held that this statute did not violate the Tenth Amendment, but did so based upon the exact reasoning rejected by the Supreme Court in *Murphy*, 138 S.Ct. at 1475 (rejecting as "empty" the attempted distinction between affirmative obligations and proscriptions upon which the Second Circuit had relied). In *Murphy*, the Supreme Court held that both compelling a state to enact legislation and prohibiting a state from enacting legislation violate the Tenth Amendment.

71.     In *City of Providence v. Barr*, No. 18-CV-00437-JJM-LDA, 2019 WL 5991039 (Nov. 14, 2019), the Court held that imposition of the Immigration Conditions was an *ultra vires* act and that the Attorney General was wrongfully "claiming a sweeping power to use Byrne JAG special conditions to impose compliance with any federal statute of their choosing." This holding was

---

[7] In 2003, the Immigration and Naturalization Service was abolished and its functions were placed under three separate agencies – U.S. Citizenship and Immigration Services (USCIS), Immigration and Customs Enforcement (ICE), and Customs and Border Protection (CBP). 6 U.S.C. §§ 211, 271, 291, 542.

just upheld by the First Circuit, which stated that the Byrne JAG statute "simply does not allow the DOJ to impose by brute force conditions on Byrne JAG grants to further its own unrelated law enforcement priorities." *City of Providence*, 2020 WL 1429579, at *8.

72. The Executive Order that initially gave rise to Defendants' current attempt to impose the Immigration Conditions on the CGIC grant to the City of Albuquerque was challenged in 2017 by the County of Santa Clara, California and the City and County of San Francisco, in *County of Santa Clara*, 250 F.Supp.3d 497. The County of Santa Clara, like the City of Albuquerque, had policies that prevented local officials from using city or county resources to send information to federal officials unless required by federal or state law, and the City of San Francisco also had a policy that prohibited local law enforcement from detaining an individual solely on the basis of a federal immigration detainer request. The County of Santa Clara challenged Executive Order 13768 on the bases that it:

> (a) violated the Separation of Powers Doctrine in the Constitution;
>
> (b) violated the anti-commandeering principle of the Tenth Amendment;
>
> (c) violated the Due Process clause due to vagueness; and
>
> (d) deprived the Plaintiffs of federal funding without notice or an opportunity to be heard, thereby also violating the procedural due process rights guaranteed by the Fifth Amendment.

73. In *County of Santa Clara*, the Court found that Congress had not given the President discretion regarding withholding or allocating funds, that the Executive Order retroactively conditioned receipt of federal grants on compliance with Section 1373, and did so in an impermissibly coercive manner, thereby violating the Spending Clause of the Constitution, and compelled them to adopt a federal regulatory program, which violated the anti-commandeering

principle of the Tenth Amendment. *Cty. of Santa Clara*, 250 F.Supp.3d at 531-34. The court concluded that the Executive Order was unconstitutional on its face and issued a nationwide injunction against its enforcement. *Id*. at 539.

74.     In 2017, the DOJ issued a memorandum in response to *County of Santa Clara* and asked for reconsideration. Concluding that the DOJ memo, while purporting to be a clarification, was at odds with the Executive Order itself, and amounted to "nothing more than an illusory promise to enforce the Executive order more narrowly" the court upheld its previous nationwide preliminary injunction. *Id*. at 1219. *Cty. of Santa Clara v. Trump*, 275 F.Supp.3d 1196, 1201 (N.D. Cal. 2017).

75.     In *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018), the Court found that Congress had **not** approved of the Executive Order.

76.     Despite the rulings of the First, Third, Seventh and Ninth Circuits, and several additional district courts that have addressed the Immigration Conditions, and the City's status as a beneficiary of a nationwide injunction, Defendants have continued to place Immigration Conditions in Byrne JAG Program grants, including the FY 2018 CGIC grant, and has failed to agree to the City Attorney's request that the Immigration Conditions be removed from the grants.

77.     The City and its residents have been harmed by the wrongful attachments of the Immigration Conditions on the FY 2018 CGIC Grant.  Thus far, the City has not been able to conduct the work described in the grant abstract and narrative, including:  hiring staff, training officers, investigators and prosecutors, collaborating with the community to reduce gun violence, and conduct the data analysis required to effectively implement the grant.

78.     During the delay in receipt of the CGIC grant funds, the City of Albuquerque experienced a substantial increase in gun-related homicides for the year of 2019.

# CAUSES OF ACTION

## COUNT ONE
### Ultra Vires Action

79.     The City incorporates by reference the allegations of the preceding paragraphs.

80.     Defendants may only exercise authority conferred to them by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 298 (2013) (how and when "agencies charged with administering congressional statutes … are to act is authoritatively prescribed by Congress, so when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

81.     The Byrne JAG statute gives Defendants no authority to impose additional substantive grant conditions on Byrne JAG funds, or to deny funds to states or local governments that fail to comply with those conditions. *See, e.g., City of Chicago*, 888 F.3d at 285 ("The inescapable problem here is that the Attorney General does not even claim that the power exercised here is authorized anywhere in the chapter, nor that the Attorney General possesses that authority and therefore can delegate it to the Assistant Attorney General."); *City of Philadelphia*, 916 F.3d at 292 ("[T]he Attorney General acted *ultra vires* in imposing the three Challenged Conditions on Byrne JAG grants."); *City of Providence*, 2019 WL 5991039 (holding that imposition of the Immigration Conditions was an *ultra vires* act and that the DOJ was "claiming a sweeping power to use Byrne JAG special conditions to impose compliance with any federal statute of their choosing"); *City of Evanston*, 412 F.Supp.3d at 881-82, 885 (holding that imposition of the Immigration Conditions was an *ultra vires* act).

82.     The formula grant structure of the Byrne JAG program gives Defendants no authority to impose conditions outside the parameters of the Byrne JAG Program as defined by Congress, including those in 34 U.S.C. 10157(b)(1).  Imposition of the Immigration Conditions by

Defendants contradicts the statutorily-established formula and the Congressional intent to give states and local governments the "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005).

83.    Defendants also lacks statutory authority to condition the receipt of Byrne JAG funds on compliance with 8 U.S.C. § 1373. The Byrne JAG statute's requirement that grantees comply with "all applicable Federal laws" refers to laws that regulate the conduct of federal grant recipients **as grant recipients**, not to every section of the U.S. Code that could possibly apply to a state or local government. *See City of Philadelphia v. Sessions*, 280 F.Supp.3d 579, 616 (E.D. Penn. 2017). Section 1373 does not regulate grantees as grantees nor does it mention federal grants or funds. "Allowing the Attorney General to withhold all funds because a jurisdiction does not certify compliance with any federal law of the Attorney General's choosing undermines the predictability and consistency embedded in the program's design." *City of Philadelphia*, 916 F.3d at 290.

84.    Sections 1373 and 1644 are unconstitutional. *See, e.g., City of Los Angeles*, 2019 WL 1957966, *4.

85.    Alternatively, construing Sections 1373 and 1644 narrowly so as to be constitutional, they do not prohibit the City's policies and provide a basis for withholding the CGIC funds. *See, e.g., City & Cty. of San Francisco*, 349 F.Supp.3d at 968-69 (determining that California and San Francisco's policies complied with Section 1373 when construed so as to be constitutional). Construing Section 1373(a) narrowly so as to be constitutional, it prohibits only the "sending to or receiving from, the Immigration and Naturalization Service information regarding the citizenship, or immigration status…of any individual." Properly construed Section 1373(b)

prohibits only a "person or agency" from restricting a governmental entity from sending, receiving, maintaining or exchanging information with other state and federal agencies.

86.     Congress has repeatedly considered and rejected legislation that would withhold grant funding as a penalty for noncooperation with federal immigration law.[8] When an agency purports to hold authority not otherwise authorized by statute, the courts should defer to Congress's judgment where it has repeatedly declined to extend the same or similar authority to that agency. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000) (holding that Congress's distinct regulatory scheme for tobacco products and repeated rejection of proposals to give the FDA jurisdiction over tobacco supported finding that the FDA did not have power to regulate tobacco products).

87.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the immigration-related conditions for the FY 2017 and FY 2018 Byrne JAG Program CGIC funds violate the constitutional principle of separation of powers, imposition of the conditions on the CGIC grant is an *ultra vires* act and amounts to an impermissible usurpation of power reserved to the legislative branch. Plaintiff is also entitled to a permanent injunction preventing the conditions from going into effect.

88.     In the alternative Plaintiff is entitled to a declaration that the City's policies, on their face, comply with federal law, including 8 U.S.C. §§ 1373 and 1644, and Defendants cannot refuse to provide the City its funds under the CGIC grant based on the challenged conditions.

---

[8] *See, e.g.,* Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. § 4 (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. § 4 (2016); Financial Services and General Government Appropriations Act, FY2017, H.R. 5485, 114th Cong., § 1217 (2016); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. § 3 (2015); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. (2015); Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. § 2 (2015); Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2 (2015).

## COUNT TWO
## Separation of Powers

89.     The City incorporates by reference the allegations of the preceding paragraphs.

90.     The Constitution vests the spending power in Congress, not the executive branch. U.S.
Const. art. I § 8, cl. 1. Absent a statutory provision or express delegation, only Congress is
entitled to attach conditions to federal funds.

91.     The executive branch "does not have unilateral authority to refuse to spend … funds" that
Congress has already appropriated "for a particular project or program." *In re Aiken Cty.*, 725
F.3d 255, 261 n.1 (D.C. Cir. 2013); *see also Train v. City of New York*, 420 U.S. 35, 44 (1975).
Imposing a new condition on a federal grant program is tantamount to refusing to spend money
already appropriated by Congress unless that condition is satisfied.

92.     The Immigration Conditions were not imposed by Congress, but rather by Defendants in
issuing the FY 2018 CGIC grant. Therefore, the Immigration Conditions are improper
assumptions of Congress's spending power by the executive branch.

**A. The Immigration Conditions are ambiguous and without explanation.**

93.     Federal conditions on state and local funding must be articulated "unambiguously."
*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Conditions are ambiguous if
a state or municipality "is unable to ascertain what is expected of it." *Id*.

94.     Immigration Conditions 49, 50, and 51 for the FY 2018 CGIC grant are ambiguous as to
what is expected of a grant recipient in Albuquerque's position, particularly given Albuquerque's
commitment to protecting the civil rights, safety, and dignity of its immigrant population.

95.     Pursuant to 28 U.S.C. §2201, Plaintiff is entitled to a declaration that the Attorney
General's imposition of the Immigration Conditions is arbitrary and capricious. Plaintiff is also

entitled to an injunction preventing the acting Attorney General from putting these conditions into effect.

**B. Defendants lack any authority to impose these Immigration Conditions.**

96. No legal basis exists for the Immigration Conditions. The Byrne JAG statute give the Defendants no authority to impose the Immigration Conditions on receipt of any type of Byrne JAG Program funds. While Congress has expressly conferred such authority in other federal grant programs, including those in Chapter 34 of the U.S. Code, it has not done so for the Byrne JAG Program.[9] "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. U.S.*, 464 U.S. 16, 23 (1983).

97. Though the Byrne JAG statute requires grantees to comply with "all applicable Federal laws," that phrase refers to the laws that regulate the conduct of the recipient as a grantee, not every section of the U.S. Code that could possibly apply to a local government. *City of Philadelphia*, 916 F.3d at 289-90; *City of Providence*, 2020 WL 1429579, *10.

98. Congress has never passed legislation authorizing the executive branch to impose any penalty on local jurisdictions based on the refusal to comply with detainer or other immigration enforcement requests.

**C. Relief**

---

[9] *See, e.g.*, 34 U.S.C. § 10446(e)(3) (stating "in disbursing grants under this subchapter, the Attorney General may impose reasonable conditions on grant awards to ensure that the States meet statutory … requirements"). It should be noted that the Second Circuit failed to recognize or address this difference between Byrne JAG and other types of grants. *States of New York*, No. 19-267, 2020 WL 911417 (2nd Cir. Feb. 26, 2020).

99.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Immigration Conditions for the FY 2017 and FY 2018 Byrne JAG Program funds violate the constitutional principle of separation of powers and amount to an impermissible usurpation of power reserved to the legislative branch. Plaintiff is also entitled to a permanent injunction preventing the conditions from going into effect. The City is further entitled to a writ of mandamus compelling Defendants to release immediately the FY 2018 Byrne JAG Program GCIC grant funds to the City.

## COUNT THREE
### Administrative Procedure Act

100.    The City incorporates by reference the allegations of the preceding paragraphs.

101.    Even assuming *arguendo* that Defendants had a constitutional or statutory basis to impose the Immigration Conditions, Defendants' decision to impose them is arbitrary and capricious.

102.    Defendants departed from more than a decade of prior practice when it imposed Immigration Conditions on Byrne JAG Program CGIC grants. Defendants have provided no explanation for this decision, despite being required by law to do so. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not … depart from a prior policy *sub silentio*."). Prior to 2016, Defendants have never imposed immigration-related conditions on federal public safety fund grantees.

103.    Defendants have "relied on factors which Congress has not intended [them] to consider" by requiring grant applicants to comply with conditions that are not contained in the express statutory application requirements. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

104.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Immigration Conditions for the FY 2017 and FY 2018 Byrne JAG GCIC funds were imposed in an arbitrary and capricious manner, violate the Administrative Procedure Act, and amount to unlawful agency action. Plaintiff is also entitled to an injunction preventing the Immigration Conditions from going into effect. The City is further entitled to a writ of mandamus compelling Defendants to release immediately the FY 2018 Byrne JAG Program GCIC grant funds to the City.

<div align="center">

**COUNT FOUR**
**Spending Clause**

</div>

105.    The City incorporates by reference the allegations of the preceding paragraphs.

106.    Congress could not have authorized the Immigration Conditions because they do not satisfy the requirements of the Spending Clause.

107.    Accordingly, those Immigration Conditions must be enjoined and Defendants must provide Albuquerque with the FY 2018 CGIC funds to which is rightfully entitled. *See Nat'l Fed'n of Indep. Bus. v. Sibelius*, 567 U.S. 519, 585 (2012) (holding that the appropriate remedy for a funding condition that violates the Spending Clause is to bar the federal government from withholding funds).

**A.    The Immigration conditions are not related to the purpose of the CGIC funds.**

108.    Conditions on spending grants must be reasonably related or germane to the federal interest that underlies the grant program. *South Dakota v. Dole*, 483 U.S. 203, 207-208 & n.3 (1987); *see also New York v. United States*, 505 U.S. 144, 167 (1992) (the attached "conditions must … bear some relationship to the purpose of the federal spending"). This ensures that the federal government does not use spending conditions to regulate state and local governments beyond the requirements of the spending program itself. *See N. Ill. Chapter of Associated*

*Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1006 (7th Cir. 2005) ("Conditions on spending may become regulation if they affect conduct other than the financed project.").

109.    None of the three Immigration Conditions are "reasonably related" or "germane[]" to the federal interest that underlies the Byrne JAG Program CGIC grant. The three conditions all deal with federal immigration law, not state or local criminal law relevant to crimes involving firearms.

110.    The Immigration Conditions are also not relevant to the general federal interest in the Byrne JAG Program. The central objectives of the Byrne JAG Program are to (1) ensure that funds are distributed across the country in a way that accounts for population and rates of violent crime and (2) "give State and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89.

111.    The Immigration Conditions undermine the goals of the Byrne JAG Program CGIC grant by diverting funds from the programs and actions designed to fulfill the purpose of CGIC grants, to compliance with challenged conditions that do not further the purposes of the CGIC grant— the reduction of gun-related violence.

112.    The Immigration Conditions require the City to use its resources, including employees and funds, to enforce federal civil immigration law.

113.    The Immigration Conditions, being unrelated to and inimical to the purposes of the Byrne JAG Program CGIG grant, are impermissible under the Spending Clause.

**B.    The Immigration Conditions are unconstitutionally ambiguous.**

114.    Defendants' imposition of the conditions also violates the requirement that Spending Clause legislation be unambiguous. When conditions are attached to a state or municipality's

acceptance of federal funds, "the conditions must be set out unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (citation and quotation omitted).

115.　　The Immigration Conditions are all ambiguous as to what is expected of Albuquerque, particularly given the City's Immigrant Friendly resolutions and ordinances, and particularly given that the City does not own or operate a correctional facility.

**C.　　The Immigration Conditions are unconstitutionally coercive.**

116.　　The Spending Clause prohibits grant conditions that are "so coercive as to pass the point at which 'pressure turns into compulsion.'" *Dole*, 483 U.S. at 211 (citation omitted).

117.　　The Immigration Conditions force Albuquerque to either engage in unconstitutional behavior that violates its own law and policy or forego CGIC funds.

118.　　The loss of CGIC funds would limit the effectiveness of the City's Police Department in combatting firearm related offenses. The delayed access to the CGIC funds has already limited the City's ability to effectively combat firearms related offenses.

119.　　The Immigration Conditions therefore threaten financial consequences that exceed the point at which pressure turns to constitutionally impermissible compulsion.

**D.　Relief**

120.　　Pursuant to 28 U.S.C. § 2201, Albuquerque is entitled to a declaration that the imposition of the FY 2018 CGIC grant Immigration Conditions violates the Constitution's Spending Clause and an injunction preventing those conditions from going into effect. The City is further entitled to a writ of mandamus compelling Defendants to release immediately the FY 2018 Byrne JAG Program GCIC grant funds to the City.

## COUNT FIVE
### Tenth Amendment: Commandeering

121.    The Tenth Amendment prohibits the federal government from directing states and

localities "to govern according to Congress' instructions." *New York*, 505 U.S. at 162. The anti-

commandeering principle ensures that states and municipalities may legislate as they see fit to

promote the safety and welfare of their residents. Congress cannot "unequivocally dictate[] what

a state [or local] legislature may and may not do … [the] Constitution gives Congress no such

power." *Murphy*, 138 S. Ct. at 1485.

122.    Where the "whole object" of a federal statutory provision is to "direct the functioning" of

state and local governments, that provision is unconstitutional and must be enjoined. *Printz v.*

*United States*, 521 U.S. 898, 932 (1997). That description precisely fits the Immigration

Conditions imposed on the FY 2018 CGIC grant.

123.    The Immigration Conditions require the City to restructure existing law enforcement

policies and procedures to accommodate the immigration related policies of the federal

government. This clearly violates the Tenth Amendment's anti-commandeering principle. "The

Federal Government may . . . [not] command the States' officers, or those of their political

subdivisions, to administer or enforce a federal regulatory program." *Murphy*, 138 S. Ct. at 1477

(quoting *Printz*, 521 U.S. at 935).

124.    The Immigration Conditions therefore impermissibly commandeer the local government

and cannot be validly imposed on CGIC funding recipients.

125.    When Congress enacted Section 1373, it sought to ensure that "[t]he acquisition,

maintenance, and exchange of immigration-related information by State and local agencies"

could be used to enforce federal law. S. Rep. No. 104-249, at 19-20 (1996). In doing so, it sought

to require state and local officers to provide information that belongs to the state and is available

to them only in their official capacity, or rather, to engage in unconstitutional commandeering. *Printz*, 521 U.S. at 932 n.17; *see also City of Philadelphia v. Sessions*, 309 F.Supp.3d 289, 329 (E.D. Pa. 2018) ("On [its] face, [Section 1373] regulate[s] state and local governmental entities and officials, which is fatal to [its] constitutionality under the Tenth Amendment"); *City of Chicago*, 321 F.Supp.3d at 872 ("Section 1373 impermissibly directs the functioning of local government in contravention of Tenth Amendment principles.").

126.    The federal immigration statutes with which Albuquerque is required comply remove the City's ability to control the action of its own employees, a critical requirement for successful governance. States and local governments can act "only through [their] officers and agents." *Nevada v. Hicks*, 533 U.S. 353, 365 (2001) (citation omitted). Statutes like Section 1373, Section 1644, and the others with which Albuquerque is required to comply require state officers to follow federal directives and seize control of the state and local-level policymaking process.

127.    The direct and proximate result of these unconstitutional conditions would be to force the City to accept unlawful conditions that force it to either engage in unconstitutional behavior that violates its own law and policy or forego CGIC funds and shut down or materially alter the programs those funds are intended to support.

128.    Pursuant to 28 U.S.C. § 2201, Albuquerque is entitled to a declaration that the imposition of the Immigration Conditions for FY 2018 Byrne JAG Program CGIC grant violate the Tenth Amendment as well as an injunction preventing those conditions from going into effect.  The City is further entitled to a writ of mandamus compelling Defendants to release immediately the FY 2018 Byrne JAG Program GCIC grant funds to the City.

### PRAYER FOR RELIEF

WHEREFORE, The City of Albuquerque prays that this Court:

A.    Declare that the Immigration Conditions for the FY 2018 Byrne JAG Program CGIC grant are unlawful;

B.    Enjoin Defendants from enforcing the Immigration Conditions for the FY 2018 Byrne JAG Program CGIC grant and retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

C.    Enjoin Defendants from withholding, terminating, or clawing back the CGIC funds on account of the City expending its own funds to accomplish activities pursuant to the CGIC grant that the improperly withheld CGIC funds would have covered;

D.    Issue a writ of mandamus compelling Defendants to immediately issue a FY 2018 Byrne JAG Program CGIC grant award without the challenged Immigration Conditions and revising the Project Period and Budget Period to extend to three years from the date the funds are released to the City;

E.    Issue a writ of mandamus compelling Defendants to immediately release FY 2018 Byrne JAG Program CGIC funds to the City;

F.    Award the City its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

G.    Grant such other relief as the Court may deem proper.

Respectfully submitted,

<div style="margin-left: 40%;">

LORENZ LAW

*/s/ Alice T. Lorenz* _____
Alice T. Lorenz
2501 Rio Grande Blvd NW
Suite A
Albuquerque, NM 87104
Telephone: (505) 247-2456
Facsimile: (505) 242-6655
Email: alice@alorenzlaw.com

ALBUQUERQUE CITY ATTORNEY

*/s/ Lindsay Van Meter* _____
Esteban A. Aguilar, Jr., City Attorney
Lindsay Van Meter
Adam Leuschel
P.O. Box 2248
Albuquerque, NM 87103
Telephone (505) 768-4500
Facsimile: (505) 768-4525
Email: eaj@cabq.gov
            lvanmeter@cabq.gov
            aleuschel@cabq.gov

</div>

**CITY OF ALBUQUERQUE,**

      **Plaintiff,**

**v.**                             **No.**

**WILLIAM P. BARR,**
**In his official capacity as Attorney**
**General of the United States, and**
**the UNITED STATES DEPARTMENT**
**OF JUSTICE,**

      **Defendants.**

## <u>VERIFICATION</u>

I, Maria Garcia-Cunningham, being first duly sworn on oath deposes and says:

(1) I am employed by the Albuquerque Police Department, City of Albuquerque, as the Planning Manager.

(2) My responsibilities the development, submission, analysis, quality performance, and monitoring of all APD's grants and grant-related procurement and contracts.

(3) My duties include managing the administrative and fiscal aspects of awarded projects and grants. These duties require knowledge of: funding agencies; institutional and departmental requirements; in-house systems; project costing; financial reporting; commitment control; purchasing; accounts payable; accounts receivables; and billing. My duties also require the ability to interpret funding requirements and competency.

(4) I am also responsible for assisting with the development of legislation of grants and grant-related contracts; attending Finance and Government Operations and City Council meetings; and answering questions as needed.

(5) I am familiar with the Byrne JAG Crime Gun Intelligence Center Integration Initiative FY 2018 Grant ("CGIC Grant"). I am familiar with the solicitation, application, and award documentation for the CGIC Grant.

(6) I have read the attached *Verified Petition for Injunctive Relief, Declaratory Relief, and a Writ of Mandamus*, am familiar with the facts alleged in it, and hereby verify that the factual allegations contained in therein are true and correct to the best of my information, understanding and belief.

Dated this 20th day of April , 2020.

*Maria Garcia-Cunningham*
Maria Garcia-Cunningham
Planning Manager
Albuquerque Police Department

SWORN to and subscribed before me this 20th day of April , 2020.

OFFICIAL SEAL
Sandra M. Jamison
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires:

My Commission Expires:
11/21/21

*Sandra M Jamison*
NOTARY PUBLIC