## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**CITY OF ALBUQUERQUE**,

                Plaintiff,

    v.

**WILLIAM P. BARR**, in his official capacity as Attorney General of the United States, and the **U.S. DEPARTMENT OF JUSTICE**,

                Defendants.

Case No. 1:20-cv-00371-KG-KK

## DEFENDANTS' OPPOSITION
## TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .........................................................................................................................4

I.     Statutory and Administrative Background .............................................................4

     A.     Statutory Framework ................................................................................4

     B.     The FY 2018 Crime Gun Intelligence Center Grant Program .................5

     C.     The Immigration and Nationality Act .....................................................6

     D.     The Challenged Conditions.......................................................................9

           1.     Special Conditions in Byrne JAG Formula Grant Awards .............9

           2.     Special Conditions in FY 2018 Crime Gun Intelligence
                 Center Awards .........................................................................11

II.     Factual and Procedural Background........................................................................12

     A.     The *City of Evanston* Litigation ...........................................................12

     B.     The City's FY 2018 CGIC Grant Award ...............................................13

LEGAL STANDARD ...............................................................................................................15

ARGUMENT ............................................................................................................................16

I.     The City Will Not Suffer Irreparable Injury Absent a Preliminary Injunction. ......16

     A.     The City Has Not Shown *Per Se* Irreparable Injury Based on an
           Ongoing Deprivation of a Constitutional Right. ....................................17

     B.     The City Has Not Shown That It Will Be Irreparably Harmed Unless It
           Immediately Receives the CGIC Grant Funds. ......................................19

II.     The City Is Unlikely to Succeed on the Merits of Its Claims. .................................20

     A.     The Attorney General Did Not Exceed His Statutory Authority or
           Violate the Separation of Powers by Including the Challenged
           Conditions in FY 2018 CGIC Grants. ...................................................20

           1.     Including the challenged conditions in FY 2018 CGIC
                 grants was a permissible exercise of the Attorney
                 General's discretion under 34 U.S.C. § 10157(b)(1). ......................21

       2.      <u>The City Inaccurately Conflates CGIC Grants with Byrne JAG Formula Grants</u>...................................................................25

B.     The Attorney General Did Not Violate the Administrative Procedure Act by Including the Challenged Conditions in FY 2018 CGIC Awards....................................................................................................28

C.     The Challenged Conditions Do Not Violate the Tenth Amendment........................30

D.     The Challenged Conditions Do Not Violate the Spending Clause.............................32

III.    The Equities and the Public Interest Tilt Against Preliminary Injunctive Relief.......................................................................................................................33

CONCLUSION...............................................................................................................34

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Idaho Falls Sch. Dist. No. 91,*
    291 F. Supp. 3d 1162 (D. Idaho 2017) ................................................................................33

*Arizona v. United States,*
    567 U.S. 387 (2012) ...............................................................................................*passim*

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...............................................................................................30

*Awad v. Ziriax,*
    670 F.3d 1111 (10th Cir. 2012) ......................................................................... 17, 18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...............................................................................................30

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC,*
    562 F.3d 1067 (10th Cir. 2009) ...........................................................................15

*California ex rel. Becerra v. Sessions,*
    284 F. Supp. 3d 1015 (N.D. Cal. 2018) ...............................................................19

*Cherokee Nation v. Bernhardt,*
    936 F.3d 1142 (10th Cir. 2019) ...........................................................................28

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ...............................................................................................21

*City & County of San Francisco v. Sessions,*
    349 F. Supp. 3d 924 (N.D. Cal. 2018) ......................................................... 18, 26

*City of Chicago v. Barr,*
    888 F.3d 272 (7th Cir. 2018) .................................................................................26

*City of Chicago v. Barr,*
    961 F.3d 882 (7th Cir. 2020) ......................................................................... 25, 26

*City of Evanston v. Barr,*
    412 F. Supp. 3d 873 (N.D. Ill. 2019) ..................................................... 12, 13, 14, 26

*City of Evanston v. Sessions,*
    No. 18-cv-4853, 2018 WL 10228461 (N.D. Ill. Aug. 9, 2018)................... 12, 13, 14

*City of Los Angeles v. Barr,*
    929 F.3d 1163 (9th Cir. 2019) .......................................................................*passim*

*City of Los Angeles v. Barr*,
   941 F.3d 931 (9th Cir. 2019) ..................................................................................27

*City of New York v. Shalala*,
   34 F.3d 1161 (2d Cir. 1994) ...................................................................................21

*City of Philadelphia v. Att'y Gen. of U.S.*,
   916 F.3d 276 (3d Cir. 2019) ...................................................................................26

*City of Providence v. Barr*,
   954 F.3d 23 (1st Cir. 2020) .....................................................................................26

*Colorado v. U.S. Dep't of Justice*,
   No. 19-cv-00736, 2020 WL 1955474 (D. Colo. Apr. 23, 2020) ....................... 26, 28

*Dalton v. Specter*,
   511 U.S. 462 (1994) ................................................................................................21

*DeNovellis v. Shalala*,
   135 F.3d 58 (1st Cir. 1998) .....................................................................................19

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
   269 F.3d 1149 (10th Cir. 2001) ..............................................................................16

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
   356 F.3d 1256 (10th Cir. 2004) ..............................................................................17

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................................................17

*Ely v. Velde*,
   451 F.2d 1130 (4th Cir. 1971) ................................................................................25

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ................................................................................................29

*FDIC v. Canfield*,
   967 F.2d 443 (10th Cir. 1992) ................................................................................22

*Free the Nipple-Fort Collins v. City of Fort Collins*,
   916 F.3d 792 (10th Cir. 2019) ..........................................................................*passim*

*Fullilove v. Klutznick*,
   448 U.S. 448 (1980) ................................................................................................34

*Greater Yellowstone Coal. v. Flowers*,
   321 F.3d 1250 (10th Cir. 2003) ..............................................................................17

*GTE Corp. v. Williams,*
   731 F.2d 676 (10th Cir. 1984) .................................................................................................. 19

*Heideman v. S. Salt Lake City,*
   348 F.3d 1182 (10th Cir. 2003) ................................................................................................ 19

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs,*
   702 F.3d 1156 (10th Cir. 2012) .......................................................................................... 28, 30

*Hohe v. Casey,*
   868 F.2d 69 (3d Cir. 1989) ...................................................................................................... 18

*Inland Empire-Immigrant Youth Collective v. Nielsen,*
   No. 17-cv-2048, 2018 WL 1061408 (C.D. Cal. Feb. 26, 2018) ............................................ 33

*Leathers v. Leathers,*
   856 F.3d 729 (10th Cir. 2017) ................................................................................................ 32

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ................................................................................................................ 28

*Morton v. Ruiz,*
   415 U.S. 199 (1974) ................................................................................................................ 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................................................ 28, 30

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
   138 S. Ct. 1461 (2018) ............................................................................................................ 31

*N.M. Dep't of Game & Fish v. U.S. Dep't of Interior,*
   854 F.3d 1236 (10th Cir. 2017) ...................................................................................... 2, 17, 20

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) ................................................................................................................ 31

*New York v. Dep't of Justice,*
   951 F.3d 84 (2d Cir. 2020) .......................................................................................... 4, 25, 28, 34

*New York v. United States,*
   505 U.S. 144 (1992) ................................................................................................................ 31

*Nielsen v. Preap,*
   139 S. Ct. 954 (2019) ........................................................................................................... 7, 8

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................................................................ 33

*NLRB v. SW Gen., Inc.,*
   137 S. Ct. 929 (2017) .................................................................................................22

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft,*
   389 F.3d 973 (10th Cir. 2004) ........................................................................... 16, 19

*Oregon v. Trump,*
   406 F. Supp. 3d 940 (D. Or. 2019) ............................................................... 18, 26, 32

*Printz v. United States,*
   521 U.S. 898 (1997) ...................................................................................................31

*Pub. Serv. Co. of N.H. v. Town of West Newbury,*
   835 F.2d 380 (1st Cir. 1987) ......................................................................................17

*RoDa Drilling Co. v. Siegal,*
   552 F.3d 1203 (10th Cir. 2009) ............................................................................ 17, 18

*Sampson v. Murray,*
   415 U.S. 61 (1974) .....................................................................................................19

*Schrier v. Univ. of Colo.,*
   427 F.3d 1253 (10th Cir. 2005) ........................................................................ 1, 15, 16

*Siegel v. LePore,*
   234 F.3d 1163 (11th Cir. 2000) ..................................................................................17

*South Dakota v. Dole,*
   483 U.S. 203 (1987) .............................................................................................. 31, 32

*United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.,*
   883 F.2d 886 (10th Cir. 1989) ....................................................................................15

*United States v. E. Baton Rouge Parish Sch. Bd.,*
   594 F.2d 56 (5th Cir. 1979) ........................................................................................33

*United States v. House of Representatives of U.S.,*
   556 F. Supp. 150 (D.D.C. 1983) ................................................................................32

*United States v. Rumely,*
   345 U.S. 41 (1952) .....................................................................................................32

*Univ. of Tex. v. Camenisch,*
   451 U.S. 390 (1981) .............................................................................................. 1, 15

*W. Watersheds Project v. Bureau of Land Mgmt.,*
   721 F.3d 1264 (10th Cir. 2013) ..................................................................................28

*Winter v. Nat. Res. Def. Council,*
  555 U.S. 7 (2008) ......................................................................................*passim*

**Statutes**

5 U.S.C. § 706(2) ......................................................................................28

6 U.S.C. § 251(2) ......................................................................................7

6 U.S.C. § 552(d) ......................................................................................7

8 U.S.C. § 1101 ......................................................................................6

8 U.S.C. § 1226(a) ......................................................................................7

8 U.S.C. § 1226(c)(1) ......................................................................................7

8 U.S.C. § 1231(a) ......................................................................................7, 8

8 U.S.C. § 1324(a) ......................................................................................8, 11

8 U.S.C. § 1357(a) ......................................................................................7

8 U.S.C. § 1373 ......................................................................................*passim*

8 U.S.C. § 1373(a) ......................................................................................8, 31

8 U.S.C. § 1644 ......................................................................................*passim*

28 U.S.C. § 530C(a) ......................................................................................9, 27

34 U.S.C. § 10102(a)(6) ......................................................................................27

34 U.S.C. § 10152 ......................................................................................4

34 U.S.C. § 10152(a) ......................................................................................*passim*

34 U.S.C. § 10152(b) ......................................................................................4

34 U.S.C. § 10153 ......................................................................................25

34 U.S.C. § 10153(A)(5)(D) ......................................................................................9, 27

34 U.S.C. § 10156 ......................................................................................4, 12, 26

34 U.S.C. § 10156(c) ......................................................................................4

34 U.S.C. § 10157(a) ......................................................................................4

34 U.S.C. § 10157(b) ......................................................................................*passim*

34 U.S.C. § 10228 .................................................................................................4

34 U.S.C. § 10228(a) ...........................................................................................24

42 U.S.C. § 3753(a)(11) (2005) ..........................................................................24

Omnibus Crime Control and Safe Streets Act of 1968,
    codified as amended at 34 U.S.C. ch. 101..................................................4

Consolidated Appropriations Act, 2018,
    Pub. L. No. 115-141 (2018) .........................................................................5

Financial Services and General Government Appropriations Act, 2017,
    Pub. L. No. 115-31, 131 Stat. 135 (2017) ................................................10

Department of Justice Appropriations Act, 2020,
    Pub. L. No. 116-93, 133 Stat. 2317 (Dec. 20, 2019) ................................4

**Regulations**

2 C.F.R. § 200.210(b)(1)(ii) ...............................................................................9

2 C.F.R. § 200.300.................................................................................................9

2 C.F.R. § 200.300(a) ..........................................................................................27

2 C.F.R. § 2800.101..............................................................................................10

8 C.F.R. § 287.5(a) ................................................................................................7

**Other Authorities**

2 Williston on Contracts § 6:13 (4th ed.)..........................................................14

11A Charles A. Wright & Arthur R. Miller,
    *Federal Practice and Procedure* § 2948.1 (3d ed. 2015) ......................... 2, 19

Office of Justice Programs, Legal Notices,
    https://www.ojp.gov/microsite-subpage/legal-notices#vnv0b.......................13

Office of Justice Programs, DOJ Grants Financial Guide § 2.2,
    https://www.ojp.gov/funding/financialguidedoj/ii-preaward-requirements#bwwfel ..................14

# INTRODUCTION

This case involves a Fiscal Year ("FY") 2018 law-enforcement grant that Defendant Department of Justice ("Department") offered Plaintiff City of Albuquerque ("City") on October 1, 2018. *See generally* Ex. H to Pl.'s Compl. ("Award Letter"), ECF No. 1-8. The City alleges that three of the conditions attached to this grant are invalid. *See generally* Verified Pet. for Injunctive Relief, Declaratory Relief, and a Writ of Mandamus ("Pl.'s Compl."), ECF No. 1. These conditions apply only with respect to programs or activities funded by the award. *See* Award Letter at 18–20. The first condition requires grant recipients to agree not to restrict information-sharing with the Federal Government regarding the citizenship or immigration status of any individual; the second forbids grant recipients from obligating grant funds to any sub-grantee that does not comply with this information-sharing requirement; and the third requires recipients to refrain from publicly disclosing federal law-enforcement information in an attempt to shield from detection any fugitive from justice or unlawfully present alien. *See id.* On July 10, 2020, the City filed a Motion for Preliminary Injunction ("Pl.'s Mot."), ECF No. 13, requesting immediate disbursement of the grant without the three challenged conditions. Defendants oppose the City's motion for the reasons set forth in this brief.

Granting the City's motion would not serve "the limited purpose of a preliminary injunction," which "'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Schrier v. Univ. of Colo.*, 427 F.3d, 1253, 1258 (10th Cir. 2005) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). The City seeks to dramatically alter the relative positions of the parties by compelling Defendants to immediately release the grant funds at issue before this Court adjudicates the case on the merits. Such requests are "specifically disfavored" under Tenth Circuit precedent. *Id.* at 1259. Accordingly, the City's motion "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course," *id.*, and the City "faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms

factors," *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019).  The City fails to carry this heightened burden for three independent reasons.

First, the City has not satisfied "the single most important prerequisite for the issuance of a preliminary injunction," *i.e.*, a showing that it likely will be irreparably harmed unless a preliminary injunction issues.  *N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1249 (10th Cir. 2017).  The City asserts that it faces a Hobson's choice between acquiescing to allegedly unconstitutional grant conditions and forgoing federal funds.  But the City does not require *immediate* relief from this purported dilemma; it is not currently being forced to take, or prevented from taking, any action to which it objects, and all of the relief the City requests would still be available at the end of this litigation if the City prevails.  The City also asserts that the grant funds are immediately needed for law-enforcement purposes, but it is well settled that a "temporary loss of income which may be recovered later does not usually constitute irreparable injury."  11A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 n.2 (3d ed. 2015).  Moreover, the City's claim that it urgently needs the funds is belied by the fact that the City did not move for a preliminary injunction until more than two months after it filed its complaint, and nearly a year and a half after the Department made clear that it would not issue the grant without the three challenged conditions.

Second, the City has not carried its heightened burden to show a likelihood of success on the merits.  Much of the City's merits argument inaccurately conflates the competitive Crime Gun Intelligence Center ("CGIC") grant at issue here with formula grants issued under the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") Program.  CGIC grants are authorized under 34 U.S.C. § 10157(b), which gives the Attorney General broad authority over whether and on what terms to offer discretionary grants to high-crime jurisdictions, whereas Byrne JAG grants are authorized under 34 U.S.C. §§ 10152(a) and allocated pursuant to 34 U.S.C. § 10156, which prescribes a statutory formula according to which the Attorney General is to disseminate funds to states and local law

enforcement agencies.   Section 10157(b)—the provision that applies here—explicitly delegates authority to the Attorney General (1) to decide whether to use a pool of allocated funds for discretionary grantmaking; (2) to design grant programs, such as the competitive CGIC program, that promote one or more purpose related to criminal justice; and (3) to determine which, if any, high-crime jurisdictions should receive grants under such discretionary programs.   Including the three challenged conditions in FY 2018 CGIC grants was plainly a permissible exercise of this broad delegation of grantmaking authority, and the City's motion fails to sustain any other conclusion.

The City's Administrative Procedure Act ("APA"), Tenth Amendment, and Spending Clause arguments are also without merit.   The Attorney General's decision to use discretionary law-enforcement grants to encourage state and local jurisdictions to share certain information with federal authorities, and to forbid recipients of such grants from using the funds to interfere with federal law enforcement, is plainly reasonable and easily passes deferential judicial review under APA.   The Tenth Amendment anti-commandeering doctrine prevents the Federal Government from issuing direct orders to states or localities; it is not implicated where, as here, the Federal Government offers money to a state or local jurisdiction on the condition that the state adopt, or refrain from adopting, a particular policy.   And the City fails to meaningfully develop any argument that the challenged conditions are impermissibly ambiguous or otherwise invalid under the Spending Clause.

Third, the City has not carried its heightened burden to "establish . . . that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  Defendants have strong interests in enforcing federal law, encouraging states and localities to share information with federal authorities, and preventing grantees from using federal funds to thwart federal law enforcement.   The City's attempt to immediately obtain a discretionary law-enforcement grant while maintaining that it may use the funds to "hamper[] the enforcement of federal laws, or worse, violat[e] those laws," is neither equitable nor in the public

interest; to the contrary, it is "disquieting." *New York v. Dep't of Justice*, 951 F.3d 84, 107 (2d Cir. 2020).

For these reasons, and as further described below, the City's motion should be denied.

## BACKGROUND

### I.      Statutory and Administrative Background

#### A.      Statutory Framework

The Byrne JAG Program provides federal funds to States and units of local government for various law enforcement purposes, pursuant to title I of the Omnibus Crime Control and Safe Streets Act of 1968 ("Crime Control Act"), codified as amended at 34 U.S.C. ch. 101.  Of the amount appropriated for the Byrne JAG Program in a given year, a percentage (which varies from year to year) is deducted for the management and administrative expenses of the Department's Office of Justice Programs ("OJP"), which manages the Byrne JAG Program, and additional amounts are set aside as may be indicated in the appropriations act.  *See, e.g.*, Department of Justice Appropriations Act, 2020, Pub. L. No. 116-93, div. B, tit. II, § 212, 133 Stat. 2317, 2413–14 (Dec. 20, 2019).  The vast majority of the remaining balance is allocated among states and units of local government according to a statutory formula predicated on population and crime statistics.  *See* 34 U.S.C. § 10156.  State recipients are required to distribute a portion of their Byrne JAG formula grants to localities within the State through a subgrant process, and all recipients may further distribute Byrne JAG funds through subgrants to units of local government and community organizations.  *Id.* §§ 10152(b), 10156(c).

The Crime Control Act also provides that, in each fiscal year, "the Attorney General shall reserve" up to $20 million of all appropriations for the Byrne JAG program for use by the National Institute of Justice ("NIJ") and up to $20 million more for grants related to certain antiterrorism training programs.  *Id.* § 10157(a).  Of particular relevance here, the statute further provides:

> Of the total amount made available to carry out [the Byrne JAG program] for a fiscal year, the Attorney General may reserve not more than 5 percent, to be granted to 1 or more States or units of local government, for 1 or more of the purposes specified in [34 U.S.C. § 10152], pursuant to his determination that the same is necessary—**(1)** to

4

combat, address, or otherwise respond to precipitous or extraordinary increases in crime, or in a type or types of crime[.]

*Id.* § 10157(b)(1).  Section 10152, in turn, states:

> [T]he Attorney General may . . . make grants to States and units of local government, for use by the State or unit of local government to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of the following programs:
>
>> (A) Law enforcement programs.
>> (B) Prosecution and court programs.
>> (C) Prevention and education programs.
>> (D) Corrections and community corrections programs.
>> (E) Drug treatment and enforcement programs.
>> (F) Planning, evaluation, and technology improvement programs.
>> (G) Crime victim and witness programs (other than compensation).
>> (H) Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams.

*Id.* § 10152(a)(1); *see also id.* § 10251(a)(1) (defining "criminal justice" in very broad terms).  Section 10152 expressly provides that this list of permissible purposes "shall be construed" to include "any purpose for which a grant was authorized to be used under [the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs and the Local Government Law Enforcement Block Grants program] as those programs were in effect immediately before January 5, 2006."  *Id.* § 10152(a)(2); *see also id.* § 10251(b)(1); 42 U.S.C. §§ 3751, 3573(a) (2005) (listing a wide range of law-enforcement-related purposes for which grants under the former Edward Byrne Memorial program could be used immediately before January 5, 2006).

**B.      The FY 2018 Crime Gun Intelligence Center Grant Program**

Congress appropriated $415.5 million for the Byrne JAG program in FY 2018, with certain carve-outs for specific initiatives.  *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. B, tit. II, 132 Stat. 348, 420 (2018).  The Attorney General exercised his discretion under 34 U.S.C. § 10157(b)(1) to reserve up to five percent of this amount for the following programs: (1) Supporting Innovation: Field-Initiated Programs to Improve Officer and Public Safety, which "invite[s] applicants

to develop and test solutions that will improve officer and public safety and save lives," Administrative Record ("AR") at 1286, ECF No. 10; (2) Technology Innovation for Public Safety Addressing Precipitous Increases in Crime, which promotes "information sharing solutions to address critical gaps in crime prevention and response activities across organizations and jurisdictions," Ex. 1 at 4; (3) the National Public Safety Partnership, which "directly engage[s] with cities to identify and prioritize resources that will help local communities address their violent crime crises," National Public Safety Partnership, About, https://www.nationalpublicsafetypartnership.org (last visited Aug. 7, 2020); and (4) the Local Law Enforcement Crime Gun Intelligence Center Integration Initiative ("CGIC Program"), which is the grantmaking program at issue here.

The CGIC Program is "part of the Project Safe Neighborhoods ("PSN") suite of programs, which is focused on reducing violent crime." AR 1043. The CGIC Program promotes collaboration between a state or local law enforcement agency and the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF"), "focus[ing] on the immediate collection, management, and analysis of crime gun evidence, such as shell casings, in real time, in an effort to identify shooters, disrupt criminal activity, and prevent future violence." AR 1043–44. In order to be considered for a CGIC award, applicants "must demonstrate they are experiencing a precipitous increase in violent firearms-related crime." AR 1068. The CGIC Program is competitive; the FY 2018 solicitation indicated the Department's intent "to make up to five awards of up to $800,000 each." AR 1048. Like all programs funded pursuant to § 10157(b)(1), the CGIC Program is administered entirely separately from the Byrne JAG formula grant program and without regard to the requirements of that program. *See* AR 1040–80.

## C.     The Immigration and Nationality Act

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, creates an "extensive and complex" framework for the "governance of immigration and alien status." *Arizona v. United States*, 567 U.S. 387, 395 (2012). The INA "specifie[s] which aliens may be removed from the United

6

States and the procedures for doing so." *Id.* at 396.  It provides that certain federal officers shall "have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain" in the United States.  8 U.S.C. § 1357(a).  This power may be exercised "anywhere in or outside" the United States.  8 C.F.R. § 287.5(a).

In enacting the INA, Congress recognized that some aliens—those who commit certain crimes—will be subject to both state (or local) criminal enforcement and federal immigration enforcement.  Generally speaking, the INA provides that (1) these aliens will serve any term of state or local imprisonment; and (2) federal immigration officials will take them into custody upon their release.  *See* 8 U.S.C. §§ 1226(a), 1226(c), 1231(a).  As described below, Congress designed this system based on the premise that states and localities would not interfere with the Federal Government's efforts to assume custody of removable aliens upon their release from state or local custody.

The INA authorizes the Secretary of Homeland Security to issue a warrant for an alien's arrest, pursuant to which the Department of Homeland Security ("DHS") may arrest and detain the alien "pending a decision on whether the alien is to be removed from the United States."  *Id.* § 1226(a).[1] DHS generally is not to take custody of a potentially removable alien who is in state or local criminal custody, but is authorized to arrest and detain the alien immediately upon his release.  *See id.*  And if the alien has a certain criminal history or has engaged in certain terrorist activities, DHS "shall" take the alien into custody "when the alien is released" from state or local custody and may not (with a narrow exception) release the alien for the duration of the removal proceedings.  8 U.S.C. § 1226(c)(1), (2); *see also Nielsen v. Preap*, 139 S. Ct. 954, 963 (2019) (discussing this "mandatory-detention scheme").

Similarly, an alien in state or local criminal custody who is already subject to a final order of removal may not be removed by DHS "until the alien is released from imprisonment."  8 U.S.C.

---

[1] Section 1226(a) refers to the Attorney General, but the relevant functions have been transferred to the Secretary of Homeland Security.  *See* 6 U.S.C. §§ 251(2), 552(d).

§ 1231(a)(4)(A).  DHS "shall" remove the alien from the United States "within a period of 90 days" from "the date the alien is released," *id.* § 1231(a)(1)(A), (B)(iii), and "shall detain the alien" during this removal period, *id.* § 1231(a)(2).  In addition, if the alien has a qualifying criminal history, "[u]nder no circumstance" may DHS release the alien during the removal period.  *Id.*  Thus, the INA's system for dealing with aliens who are subject to both state criminal detention and federal immigration detention plainly contemplates cooperation between state and federal officials.  *See Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system.").

Reinforcing its expectation of federal-state cooperation, Congress enacted 8 U.S.C. § 1373(a), which provides that "State" and "local government entit[ies] or official[s] may not prohibit, or in any way restrict," any government entity or official from sharing "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" with federal immigration authorities.  *See also id.* § 1373(b) ("[N]o person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from" "[s]ending" to or "requesting or receiving" from federal immigration authorities "information regarding the immigration status, lawful or unlawful, of any individual," "[m]aintaining" such information, or "[e]xchanging" such information with "any other . . . government entity").

The gravity of the public policy expressed in the INA is underscored by 8 U.S.C. § 1324(a), which, among other things, imposes criminal liability on anyone who

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation.

8 U.S.C. § 1324(a)(1)(A)(iii).  Section 1324(a) also makes it a federal crime to "engage[] in any conspiracy to commit any of the preceding acts," or to "aid[] or abet[] the commission of any of the preceding acts."  *Id.* § 1324(a)(1)(A)(v).

### D.     The Challenged Conditions

#### 1.     Special Conditions in Byrne JAG Formula Grant Awards

In May 2016, prompted by a congressional inquiry, the Department's Office of the Inspector General ("OIG") issued a memorandum to the Assistant Attorney General ("AAG") for OJP raising concerns about noncompliance with 8 U.S.C. § 1373 by ten jurisdictions receiving Department grants. *See* AR 110–303 (documents related to the congressional inquiry); AR 366–81 (OIG memorandum). As a result, the Department specifically identified § 1373 as an "applicable Federal law[]" for purposes of the Byrne JAG Program. AR 384–85; *see also* 34 U.S.C. § 10153(A)(5)(D) (requiring grant applicants to certify that they "will comply with all provisions of" title I of the Crime Control Act "and all other applicable Federal laws"). The Department included a new condition in the FY 2016 Byrne JAG awards for several of the jurisdictions singled out in the OIG report, requiring each jurisdiction to review and verify its compliance with § 1373. *See, e.g.*, AR 455 (¶ 53) (condition in New York City's FY 2016 Byrne JAG award). No jurisdiction challenged this FY 2016 condition.

The Department subsequently published FY 2017 guidance explaining that "all Byrne/JAG grant applicants must certify compliance with all applicable federal laws, including Section 1373." AR 432. The guidance explained that this certification requirement would not affect Byrne JAG formula grants for FY 2016 or prior years, but that the Department expected grant recipients to "examine their policies and procedures to ensure they will be able to submit the required assurances" in the FY 2017 application. *Id.* In accordance with this guidance, the Department specified in the FY 2017 Byrne JAG formula grant solicitation that applicants would be required to certify their compliance with § 1373 in connection with their applications. AR 1016–17; *see also* AR 1033 (certification form).

In view of the national public policy manifested in the INA, discussed above, and in the exercise of the Department's authority, including under the Crime Control Act, under 28 U.S.C. § 530C(a), and under 2 C.F.R. §§ 200.300 & 200.210(b)(1)(ii) (as adopted for the Department by

9

2 C.F.R. § 2800.101),[2] the FY 2017 Byrne JAG formula grant solicitation included an announcement that two additional conditions requiring modest cooperation with federal law enforcement in the immigration setting would be placed on awards. *See* AR 1025. These conditions apply only to the "program or activity" receiving federal financial assistance under the award. *Id.* The "notice" condition requires grantees to have a policy that their detention facilities will provide notice to DHS "as early as practicable" when DHS submits a formal written request for advance notice of the scheduled release date and time for a particular alien. *See, e.g.*, AR 1687 (¶ 55.1.B) (sample FY 2017 Byrne JAG formula grant award letter). The "access" condition requires grantees to have a policy that federal agents will be "given access" to their detention facilities for the purpose of meeting with aliens and "to inquire as to such individuals' right to be or remain in the United States." *Id.* (¶ 55.1.A.). As with the § 1373-compliance condition, the notice and access conditions were designed to ensure that states and localities do not use federal law-enforcement grants to fund activities that impair federal immigration officers' discharge of their responsibilities under the INA.

In FY 2018, the Department notified potential applicants for Byrne JAG formula grants that their awards would include several conditions, similar in many respects to the FY 2017 conditions, designed to ensure that state and local governments do not use federal grant funds to interfere with federal immigration enforcement. *See* AR 1176–77, 1202–03. Local governments receiving an FY 2018 Byrne JAG formula grant were required to certify their compliance with § 1373, and a substantially identical requirement found in 8 U.S.C. § 1644, with respect to the program or activity funded by the grant ("the information-sharing requirement"). AR 1638, 1723–24. Relatedly, FY 2018

---

[2] *See* Financial Services and General Government Appropriations Act, 2017, Pub. L. No. 115-31, § 724, 131 Stat. 135, 382 ("Any request for proposals, solicitation, grant application, form, notification, press release, or other publications involving the distribution of Federal funds shall comply with any relevant requirements in part 200 of title 2, Code of Federal Regulations: *Provided*, That this section shall apply to direct payments, formula funds, and grants received by a State receiving Federal funds.").

Byrne JAG grantees were required to refrain from obligating award funds to a program or activity of a recipient or sub-grantee that does not comply with §§ 1373 and 1644 ("the non-obligation requirement").  *See* AR 1725.  In addition—in the wake of an incident in which the mayor of a large U.S. city publicly disclosed a planned operation by federal immigration authorities, *see* AR 1038–39— grantees were required to agree that they would not publicly disclose federal law-enforcement information in an attempt to harbor or shield from detection either a "fugitive from justice" under federal criminal law or an alien who "has come to, entered, or remains in the United States in violation of" federal immigration law ("the public-disclosure requirement").  AR 1726; *see* AR 1637.[3]

2. Special Conditions in FY 2018 Crime Gun Intelligence Center Awards

Also in mid-2018, the Department announced its intent to include the same, or similar, conditions in several discretionary grant programs through which state and local governments could compete for a limited pool of federal law-enforcement funds.  *See, e.g.*, AR 1606–07 (Department press release of June 28, 2018, announcing the inclusion of "new immigration compliance requirements" in four public safety grant programs); AR 1609 (announcement regarding Strategies for Policing Innovation grant program); AR 1610 (announcement regarding Innovations in Community-Based Crime Reduction grant program).  Of particular relevance here, on August 13, 2018, the Department notified potential applicants for FY 2018 CGIC grants, via email, that:

> [W]ith respect to the 'program or activity' . . . that is funded under the FY 2018 award, the recipient of the award (if and when it is accepted) will be required not to engage in conduct that would violate the provisions of 8 U.S.C. §§ 1373 and 1644 . . . and also not to engage in conduct that violates (or engage in conduct that aids or abets a violation of) 8 U.S.C. § 1324(a) (which, among other things, sets federal penalties for concealing, harboring, or shielding from detection certain aliens under certain circumstances).

---

[3] The FY 2018 Byrne JAG formula grant awards contained numerous other special conditions, including some related to state and local cooperation with federal immigration enforcement, that are not relevant for present purposes.  *See* AR 1713–33 (sample award listing all special conditions).

11

AR 1611.[4]   The Department also announced "that these conditions will be among those that a recipient must 'pass through' to subrecipients of the award."  *Id.*  Consistent with this notice, all FY 2018 CGIC grant awards contained the information-sharing requirement, the non-obligation requirement, and the public-disclosure requirement, which are Special Conditions 49, 50, and 51 in the City's CGIC grant award letter.  *See* Award Letter at 18–20.

## II.   Factual and Procedural Background

### A.   The *City of Evanston* Litigation

In July 2018, the U.S. Conference of Mayors ("USCM") and the City of Evanston, Illinois brought a lawsuit challenging the notice, access, and § 1373-compliance conditions on FY 2017 Byrne JAG formula grants.  *See City of Evanston v. Sessions*, No. 18-cv-4853, 2018 WL 10228461, at *1 (N.D. Ill. Aug. 9, 2018).  The court held that the Department lacked statutory authority to impose those conditions on FY 2017 Byrne JAG formula grants and enjoined the Department from doing so.  *Id.* at *1, *4.  In December 2018, USCM and Evanston amended their complaint to include challenges to seven conditions in the FY 2018 Byrne JAG formula grant program, including the information-sharing requirement, the non-obligation requirement, and the public-disclosure requirement.  *See City of Evanston v. Barr*, 412 F. Supp. 3d 873, 878–79 (N.D. Ill. 2019).  The court then enjoined the challenged conditions on Byrne JAG formula grants "in FY 2017, FY 2018, and in all future grant years," *id.* at 889, holding that the Attorney General lacked authority "to depart from the funding distribution formula mandated by 34 U.S.C. § 10156" by withholding the funds at issue, *id.* at 882–83.

Although the Department disagrees with the *City of Evanston* decision, and its appeal remains pending, it has complied with the injunction and will continue to do so as long as the injunction remains in place.  Because the City is a member of USCM, the Department issued the City's FY 2017,

---

[4] This email refutes the City's allegation that the Department "fail[ed] to advise the City of [these] conditions during the application period," Pl.'s Mot. at 14.

FY 2018, and FY 2019 Byrne JAG formula grant awards without enforcing the challenged conditions. *See* Ex. 2 (2017 award); Ex. 3 (2018 award); Ex. 4 (2019 award); *see also* Office of Justice Programs, Legal Notices, https://www.ojp.gov/microsite-subpage/legal-notices#vnv0b (last visited Aug. 7, 2020) (publicly declaring non-enforcement of the challenged conditions on Byrne JAG formula grants to USCM members).  The Department has also informed the State of New Mexico that the City is entitled to the benefit of the *City of Evanston* injunction with respect to Byrne JAG formula grant funds that it receives as a subgrantee of the State, even though the State's award is subject to all special conditions.  *See* Ex. 5 (email exchange between OJP and the New Mexico Department of Public Safety).

The *City of Evanston* injunction does not apply to all of the Department's grant programs, however, because the plaintiffs in that case challenged the imposition of conditions only on Byrne JAG formula grant awards.  *See* Am. Compl. ¶ 113, *City of Evanston*, No. 1:18-cv-04853 (N. D. Ill. Dec. 10, 2018), ECF No. 46 ("The Byrne JAG program's formula-grant structure contradicts the Department's purported authority to promulgate the challenged conditions.  Unlike discretionary grants, which agencies award on a competitive basis subject to agency discretion, formula grants are awarded pursuant to a statutory formula."); *see also id.* ¶¶ 16–18, 93.  Accordingly, the *City of Evanston* court did not consider the extent of the Department's authority to include conditions in discretionary grant programs, such as the CGIC Program, and the *City of Evanston* injunction plainly does not apply to such programs.  *See generally* 412 F. Supp. 3d 873; 2018 WL 10228461; *see also infra* pp. 25–27.

### B.    The City's FY 2018 CGIC Grant Award

On March 22, 2018, the Department published a grant solicitation for the FY 2018 CGIC Program.  *See* Ex. E to Pl.'s Compl., ECF No. 1-5.  On May 7, 2018, the Albuquerque Police Department ("APD") submitted an application for a CGIC grant.  *See* Def.'s Answer ¶ 42, ECF No. 9 (admitting ¶ 42 of the City's complaint).  On October 1, 2018, the Department informed the City

that APD had been selected for a CGIC grant.  *See* Award Letter at 1.  The City had 45 days within

which to accept or decline the offered award.  *See* Office of Justice Programs, DOJ Grants Financial

Guide § 2.2, https://www.ojp.gov/funding/financialguidedoj/ii-preaward-requirements#bwwfel

(last visited Aug. 7, 2020).

On November 15, 2018, the City purported to accept the offered award.  *See* Ex. I to Pl.'s

Compl. at 2, ECF No. 1-9 (signed grant document).  The City's "acceptance" was invalid, however,

because the City crossed out Special Conditions 49, 50, and 51 in the grant document, *see id.* at 15–17;

the City's response therefore "operate[d] to reject the original offer" and was instead "a counteroffer,"

2 Williston on Contracts § 6:13 (4th ed.).  The City attached to its counteroffer a letter asserting its

entitlement to receive the CGIC grant without the challenged conditions.  *See* Ex. J to Pl.'s Compl.,

ECF No. 1-10.  On December 17, 2018, the Department informed the City that it had not validly

accepted the offer and would have to resubmit its acceptance with nothing crossed out.  *See* Ex. K to

Pl.'s Compl., ECF No. 1-11.  The City responded with a letter contending that the August 2018 *City

of Evanston* injunction prevented the Department from enforcing Special Conditions 49, 50, and 51

with respect to the City's CGIC grant award.  *See* Ex. L to Pl.'s Compl., ECF No. 1-12 (citing *City of

Evanston*, 2018 WL 10228461).  On February 6, 2019, the Department informed the City that the

August 2018 *City of Evanston* injunction does not "enjoin[] the Department from enforcing any award

condition" in the City's CGIC award, and that "all the award conditions set out therein are equally

part of, and fully applicable to, that award."  Ex. N to Pl.'s Compl., ECF No. 1-14.[5]  On May 30, 2019,

the City sent the Department another letter reiterating its objections to Special Conditions 49, 50, and

51, and demanding that the Department issue its CGIC award without those conditions.  *See* Ex. 6.

---

[5] Perplexingly, the City asserts that the Department's email of February 6, 2019 ignored "the nationwide injunction entered in *Evanston*, 412 F. Supp. 3d 873" (N.D. Ill. Sept. 26, 2019), even though that injunction did not issue until nearly eight months after the email was sent.  *See* Pl.'s Mot. at 12.

The City took no further action with respect to its FY 2018 CGIC award for *nearly a year*.  On April 22, 2020, the City filed the present lawsuit, which seeks a declaratory judgment that Defendants' inclusion of Special Conditions 49, 50, and 51 in the City's FY 2018 CGIC award is unlawful, an injunction against enforcement of those conditions, and a writ of mandamus compelling Defendants to immediately disburse the grant funds without the challenged conditions.  *See* Compl. at 34.  On July 6, 2020, Defendants answered the complaint and filed the administrative record.  *See* ECF Nos. 9, 10.  On July 10, 2020—well over a year and a half after it was initially offered the FY 2018 CGIC grant— the City moved for a preliminary injunction, asserting that it is being irreparably harmed by "Defendants' refusal to release the grant funds" without the three challenged conditions.  Pl.'s Mot. at 32.  This Court should deny the City's motion for the reasons set forth below.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").  To justify this extraordinary remedy, "the movant must establish that four equitable factors weigh in its favor: (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009); *see Winter*, 555 U.S. at 20.

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Schrier*, 427 F.3d at 1258 (quoting *Camenisch*, 451 U.S. at 395).  The Tenth Circuit has identified three types of preliminary injunctions that do not serve this purpose: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary

15

injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Id.* at 1259 (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc) (per curiam), *aff'd and remanded on other grounds sub nom. Gonzalez v. O Centro Espirita Beneficiente Uniao Do Vegetal*, 544 U.S. 973 (2005)).  A preliminary injunction that falls into any of these three categories is "specifically disfavored" and "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* (quoting *O Centro*, 389 F.3d at 975).

The City's motion for a preliminary injunction is *triply* disfavored.  First, it would alter the status quo; the City asks the Court to "compel[] Defendants to immediately release the CGIC award funds," Pl.'s Mot. at 36, which would plainly upset "the last uncontested status between the parties which preceded the controversy," *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001) (citation omitted).  Second, the motion seeks mandatory relief, *i.e.*, a writ of mandamus.  Third, it requests all the relief that the City could recover if it prevails on the merits. Accordingly, the City "faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors" than a party seeking a non-disfavored preliminary injunction, and "must make a 'strong showing'" that both factors tilt in its favor.  *Fort Collins*, 916 F.3d at 797 (citation omitted).

Remarkably, the City's motion fails to reference any of this binding precedent.

## ARGUMENT

### I.     The City Will Not Suffer Irreparable Injury Absent a Preliminary Injunction.

"A showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, and therefore the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *N.M. Dep't of Game & Fish*, 854 F.3d at 1249 (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite*

*Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)).   To show irreparable harm, a plaintiff must "demonstrat[e] 'a significant risk that [it] will experience harm that cannot be compensated after the fact by monetary damages.'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).   "If 'a trial on the merits can be conducted before the injury would occur there is no need for [preliminary] relief.'" *Id.* (quoting *Greater Yellowstone*, 321 F.3d at 1260).

### A.   The City Has Not Shown *Per Se* Irreparable Injury Based on an Ongoing Deprivation of a Constitutional Right.

First, the City claims to be suffering *per se* irreparable harm based on an alleged constitutional violation.   *See* Pl.'s Mot. at 31.   But the City's statement that irreparable injury exists whenever "an alleged constitutional right is involved," *id.*, is far too broad.   The principle that deprivation of a constitutional right can be *per se* irreparable is "almost entirely restricted to cases involving alleged infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." *Pub. Serv. Co. of N.H. v. Town of West Newbury*, 835 F.2d 380, 382 (1st Cir. 1987); *see also Siegel v. LePore*, 234 F.3d 1163, 1177–78 (11th Cir. 2000); *Elrod v. Burns*, 427 U.S. 347, 348 (1976) (plurality opinion).   Thus, a Muslim plaintiff was entitled to a preliminary injunction against a law that facially discriminated against Islam because there is no "effective monetary remedy" for an ongoing "government condemnation of one's religion," in violation of the First Amendment.   *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). Similarly, female plaintiffs were granted a preliminary injunction against a law that prevented them from exposing their breasts in public because the Court determined they suffered an ongoing deprivation of equal protection that could not be remedied after resolution of the merits.   *Fort Collins*, 916 F.3d at 806.

Here, however, the City has not alleged—much less shown—any ongoing deprivation of a constitutional right that could not be remedied after a decision on the merits.   The Federal

Government is not requiring the City to take any action or forbidding the City from exercising any constitutional right; it is merely withholding federal funds pursuant to statutorily authorized conditions.  In contrast to the plaintiffs in *Awad* and *Fort Collins*, who showed that they were *presently* prevented from engaging in a constitutionally protected activity, the City claims only that "the protections provided by the Separation of Powers and Spending Clause *will* be lost *if the City accepts the [challenged] conditions*."  Pl.'s Mot. at 31 (emphasis added).  There is no risk that these alleged constitutional injuries will occur before this case is resolved on the merits, *see RoDa Drilling*, 552 F.3d at 1210, or that the Court will be unable to grant the City effective relief after a full trial, *see Awad*, 670 F.3d at 1131.  Thus, even if the City had shown a likelihood of success on the merits of one or more of its constitutional claims—which it has not, *see infra* pp. 20–28, 30–33—the City's mere act of invoking the Constitution does not warrant a finding of *per se* irreparable injury.  *See also Hohe v. Casey*, 868 F.2d 69, 72–73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction.").

Furthermore, the City ignores the crucial distinction between the standard for obtaining a permanent injunction and the standard for obtaining a preliminary injunction.  As the City observes, courts have granted permanent injunctions in cases involving conditions on Byrne JAG formula grants.  *See* Pl.'s Mot. at 31 (citing *City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 970 (N.D. Cal. 2018), *aff'd in relevant part sub nom. City & County of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020); *Oregon v. Trump*, 406 F. Supp. 3d 940, 974 (D. Or. 2019)).  But the question here is not whether the City would be entitled to a permanent injunction if it were to prevail on the merits; it is whether the City needs *immediate* relief to prevent irreparable harm while the merits are adjudicated.  Neither *City & County of San Francisco* nor *Oregon* suggests that immediate relief is appropriate here.  Indeed, in the State of California's challenge to the FY 2017 Byrne JAG conditions, which was consolidated with *City & County of San Francisco*, the court denied a motion for a preliminary injunction

18

because California failed to show that it would suffer irreparable injury unless the challenged grant conditions were *immediately* enjoined. *See California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1019 (N.D. Cal. 2018), *reconsideration denied*, No. 17-cv-04701, 2018 WL 3399214 (N.D. Cal. Apr. 24, 2018).

**B.      The City Has Not Shown That It Will Be Irreparably Harmed Unless It Immediately Receives the CGIC Grant Funds.**

The City next asserts injury from a delayed receipt of grant funds; it claims that it will be irreparably harmed unless it immediately receives $450,000 to "put into place best-practice measures" related to crime gun intelligence. *See* Pl.'s Mot. at 32–34. It is well settled, however, that a "temporary loss of income which may be recovered later does not usually constitute irreparable injury." 11A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 n.2 (3d ed. 2015) (citing *DeNovellis v. Shalala*, 135 F.3d 58, 64 (1st Cir. 1998)); *see also, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). The court applied this principle in *California*, denying the State's motion for a preliminary injunction because "the delay of a $1 million grant . . . while the litigation continues" is not an irreparable injury. *California*, 284 F. Supp. 3d at 1036. So too here.

Furthermore, the City's assertion that the grant funds are urgently needed to combat gun crime, *see* Pl.'s Mot. at 34, is belied by its lengthy delay in moving for a preliminary injunction. The Department made clear on February 6, 2019 (at latest) that it would not issue the City's CGIC award without Special Conditions 49, 50, and 51, but the City did not file its lawsuit until April 22, 2020—more than fourteen months later—and waited another 78 days before moving for a preliminary injunction. The City makes no attempt to explain, much less justify, this delay, which "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984) (citation omitted); *see also O Centro*, 389 F.3d at 1017 (McConnell, J., concurring) ("[W]hen a plaintiff is complaining of irreparable injury from a long-established state of affairs, a court may naturally ask

19

why, if the injury is so pressing as to warrant preliminary relief, the plaintiff waited so long before bringing a claim."). Moreover, the complaint suggests that the City has been able to proceed with at least some activities that the "withheld CGIC funds would have covered." Compl. at 34.

All the relief that the City seeks through its extraordinary request for a triply-disfavored preliminary injunction will still be available at the conclusion of this lawsuit if the City prevails on the merits. The City has not even alleged, much less demonstrated, an ongoing constitutional injury that could support a claim of irreparable injury, nor has it shown that it will be irreparably harmed if it does not immediately receive the funds at issue. The City's manifest failure to demonstrate irreparable injury is an independently sufficient ground for denying its motion; the Court need not consider the remaining preliminary-injunction factors. *See N.M. Dep't of Game & Fish*, 854 F.3d at 1249–50.

## II.     The City Is Unlikely to Succeed on the Merits of Its Claims.

The City's complaint contains five counts, alleging that Defendants' inclusion of the three challenged conditions in the City's FY 2018 CGIC grant award is *ultra vires* (Count One), violates the separation of powers (Count Two), violates the Administrative Procedure Act (Count Three), violates the Spending Clause (Count Four), and violates the Tenth Amendment anti-commandeering doctrine (Count Five). *See* Compl. ¶¶ 79–128. The City has not carried its heightened burden of showing that it is likely to succeed on the merits of any of these claims. *See Fort Collins*, 916 F.3d at 797.

### A.     The Attorney General Did Not Exceed His Statutory Authority or Violate the Separation of Powers by Including the Challenged Conditions in FY 2018 CGIC Grants.

Count One of the City's complaint alleges that the Department exceeded its statutory authority by including the three challenged conditions in FY 2018 CGIC grants. *See* Compl. ¶¶ 79–88. Count Two of the City's complaint is similar; it alleges that the conditions violate the separation of powers

because they "were not imposed by Congress." *Id.* ¶ 92; *see id.* ¶¶ 89–99.  Though legally distinct,[6] these two claims fail for the same reason: 34 U.S.C. § 10157(b) gives the Attorney General broad authority to craft competitive grant programs for law enforcement purposes, and including the challenged conditions in the FY 2018 CGIC Program was well within this delegation of authority.

       1.      Including the challenged conditions in FY 2018 CGIC grants was a permissible exercise of the Attorney General's discretion under 34 U.S.C. § 10157(b)(1).

"The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy . . . to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 (1974).  Broad grants of policymaking authority are common and permissible, particularly in the context of grantmaking.  *See, e.g.*, *City of Los Angeles v. Barr*, 929 F.3d 1163, 1177 (9th Cir. 2019) (recognizing that Congress gave the Department "broad authority" over the competitive Community Oriented Policing Services ("COPS") grant program). Where "Congress has explicitly left a gap for the agency to fill," the agency's decisions are entitled to "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984); *see also, e.g.*, *City of New York v. Shalala*, 34 F.3d 1161, 1167 (2d Cir. 1994) ("Because of HHS's broad discretion in this [grantmaking] area, and the fact that Congress did not speak to the issues under review, the City's argument that HHS has acted in excess of its statutory authority is without merit.").  This highly deferential standard applies here because of the express delegation of authority found in 34 U.S.C. § 10157(b).

Section 10157(b) gives the Attorney General extremely broad discretion over up to five percent of the funds appropriated for the Byrne JAG Program in each fiscal year.  First, Congress's

---

[6] *See Dalton v. Specter*, 511 U.S. 462, 471–72 (1994) (rejecting the proposition "that whenever the President [or any Executive Branch official] acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine").

instruction that "the Attorney General *may* reserve" these funds, 34 U.S.C. § 10157(b), indicates that the Attorney General has discretion over whether to make any grants under this provision at all. *See FDIC v. Canfield*, 967 F.2d 443, 446 (10th Cir. 1992) (en banc) (recognizing that "'[m]ay' is a permissive term" that establishes "discretionary power"); *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 941 (2017) (noting that "may" is "permissive," whereas "shall" is "mandatory"). Second, when the Attorney General chooses to reserve funds under § 10157(b)(1), he has broad discretion to design grantmaking programs through which to distribute those funds; the only limitation is that funds must be granted "for 1 or more of the purposes specified in [S]ection 10152." 34 U.S.C. § 10157(b). Third, the Attorney General has significant discretion over which jurisdictions should receive the funds, which may be granted to "1 or more States or units of local government" that are experiencing a "precipitous or extraordinary increases in crime, or in a type or types of crime." *Id.* § 10157(b), (b)(1).

The Attorney General's decision to create the FY 2018 CGIC Program—including the three challenged conditions—falls well within his broad authority under § 10157(b)(1). The City does not challenge the Attorney General's determination to reserve funds under § 10157(b) for the FY 2018 CGIC Program, or his determination that the City is "experiencing [a] precipitous increase[] in gun crime," Award Letter at 22–23. Accordingly, the only question is whether the three challenged conditions relate to "1 or more of the purposes specified in [S]ection 10152." 34 U.S.C. § 10157(b).

There should be no serious dispute that the three conditions serve a "criminal justice" (and "law enforcement") purpose within the meaning of § 10152(a)(1). As described above, the information-sharing and non-obligation requirements are designed to ensure that states and localities do not interfere with federal officers' efforts to investigate, detain, apprehend, and, if appropriate, remove unlawfully present aliens—particularly those who commit crimes. *See supra* pp. 7–11. Encouraging this type of information-sharing quite obviously furthers a law-enforcement purpose. *See, e.g.*, *Arizona*, 567 U.S. at 397–99 (observing that federal immigration officers "conduct[] criminal

22

investigations involving the enforcement of immigration-related statutes" (citation omitted)); *City of Los Angeles*, 929 F.3d at 1177–80 (recognizing that "illegal immigration presents a public safety issue" and elaborating on the connection between illegal immigration and crime). And the public-disclosure requirement's connection to law enforcement could not be clearer: it prevents "public disclosure of federal *law enforcement information*." Award Letter at 20 (emphasis added).

The City suggests that the conditions are *ultra vires* because "[i]mmigration enforcement is not one of [the eight] program areas" listed in § 10152(a)(1). Pl.'s Mot. at 4. This ignores the obvious relationship between the conditions and "criminal justice, including . . . [l]aw enforcement," 34 U.S.C. § 10152(a)(1)—a connection that the City itself acknowledges elsewhere in its motion, *see* Pl.'s Mot. at 5–6 (asserting that the conditions are intended "to encourage jurisdictions to change their policies and *partner with federal law enforcement to remove criminals*" (emphasis added) (internal quotation marks and citation omitted)). Indeed, when the Attorney General announced the Department's intention to include the conditions in several discretionary grants for FY 2018, he explained that they are "part of accomplishing the Department of Justice's top priority of reducing violent crime." AR 1604. The City also ignores the statute's explicit reference to "technical assistance[] and *information systems* for criminal justice." 34 U.S.C. § 10152(a)(1) (emphasis added).

If more were needed, § 10152 provides that its "criminal justice" purpose areas "shall be construed to ensure [that grant funds] may be used for any purpose for which a grant was authorized to be used under [the Edward Byrne Memorial State and Local Law Enforcement Assistance Program]" as it existed immediately before the 2006 Act went into effect. 34 U.S.C. § 10152(a)(2). Grants under that program could be put toward

> a plan under which the State will provide without fee to the Immigration and Naturalization Service, within 30 days of the date of their conviction, notice of conviction of aliens who have been convicted of violating the criminal laws of the State and under which the State will provide the Service with the certified record of such a conviction within 30 days of the date of a request by the Service for such record.

23

42 U.S.C. § 3753(a)(11) (2005).  This leaves no doubt that § 10152 "shall be construed" to permit grantmaking that promotes federal-state cooperation in immigration enforcement—which is the exact purpose of the conditions at issue here.

The City's stance that every condition included in a CGIC award must be closely tied to "reduc[ing] gun violence," which the City describes as the "specific goal" of the CGIC Program, Pl.'s Mot. at 25–26, 32, cannot be reconciled with the text of § 10157(b).  *See id.* at 6, 10 ("The immigration-related conditions are entirely unrelated to the specific purpose of the CGIC grant." (capitalization altered)).  The City ignores the express delegation of authority to the Attorney General to create discretionary grant programs "for 1 *or more* of the purposes specified in [S]ection 10152."  34 U.S.C. § 10157(b) (emphasis added).  It was the Attorney General—not Congress—who chose to create a discretionary program that primarily focuses on "reduc[ing] violent crime and the illegal use of firearms," AR 1043, and that choice did not foreclose the Attorney General from simultaneously pursuing other criminal-justice (or law-enforcement) purposes through the same program.  One need only read the text of § 10157(b)(1) to reject the City's claims that it "provide[s] limited discretion to the [Attorney General] to decide which of the applicants are experiencing such 'precipitous or extraordinary increases in crime' that they should be . . . CGIC grantees," Pl.'s Mot. at 10, and that it does not permit the Attorney General to "effectuate [other] policy goals," *id.* at 25.

The City also contends that the Department is forbidden to place the challenged conditions on the FY 2018 CGIC grant (or any other grant) by 34 U.S.C. § 10228(a).  *See id.* at 16.  That statute provides, in pertinent part:

> Nothing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof.

34 U.S.C. § 10228(a).  As the Fourth Circuit has explained, this provision is intended "to guard against any tendency towards federalization of local police and law enforcement agencies," avoiding "the

establishment of a 'federal police force'" by preventing federal authorities from controlling the "routine operations of local police forces" by, for example, "prescribing the type of shoes and uniforms to be worn" or "the type or brand of ammunition to be purchased." *Ely v. Velde*, 451 F.2d 1130, 1136–37 (4th Cir. 1971) (citation omitted).  The conditions challenged here "raise[] no such federalization concern." *New York*, 951 F.3d at 108.  They do not allow federal officers to "direct, control, or supervise the day-to-day operations of any State or local police force or law enforcement agency"; they require only that states refrain from using federal law-enforcement funds to thwart federal law-enforcement activities.  *Id.* at 108–09; *see also City of Los Angeles*, 929 F.3d at 1176 n.7; *cf. City of Chicago v. Barr* ("*City of Chicago II*"), 961 F.3d 882, 908–09 (7th Cir. 2020) (construing 34 U.S.C. § 10153 narrowly in light of § 10228).  The City's contrary assertion that the conditions "force local law enforcement to . . . act as arms of [Immigration and Customs Enforcement]" ("ICE"), Pl.'s Mot. at 2–3, is utterly divorced from reality.

In sum, § 10157(b)(1) gives the Attorney General broad authority (1) to decide whether the CGIC Program should exist at all; (2) to design the CGIC Program to promote one or more law-enforcement purposes; and (3) to determine which, if any, high-crime jurisdictions should receive a CGIC grant in a given fiscal year.  Including the three challenged conditions in the FY 2018 CGIC Program was plainly a permissible exercise of this broad delegation of grantmaking authority.

2.     The City Inaccurately Conflates CGIC Grants with Byrne JAG Formula Grants.

Much of the City's merits argument rests on the incorrect premise that the discretionary, competitive CGIC Program should be analyzed identically to the Byrne JAG formula grant program. *See, e.g.*, Pl.'s Mot. at 6–7 ("Defendants do not have lawful authority to impose immigration-based conditions on Byrne JAG awards."); *id.* at 3–4, 8, 10, 14–26.  Although the CGIC Program uses funds appropriated for the Byrne JAG Program, it is not "authorized by the same statutes" that authorize

Byrne JAG formula grants.  *Contra* Pl.'s Mot. at 18.  The CGIC Program is authorized under § 10157(b), *see supra* pp. 4–7, but Byrne JAG formula grants are authorized under § 10152(a), which provides that "the Attorney General may, *in accordance with the formula established under [S]ection 10156 . . .* make grants to states and units of local government," 34 U.S.C. § 10152(a) (emphasis added).

The Byrne JAG formula-grant cases cited by the City rest on the notion that the discretion to impose immigration-related conditions "is fundamentally inconsistent with the nature of the Byrne JAG grant as a formula grant"—"rather than a discretionary grant."  *City of Chicago II*, 961 F.3d at 902–03; *see City of Providence v. Barr*, 954 F.3d 23, 27–28, 34–35, 38, 42 (1st Cir. 2020); *City of Philadelphia v. Att'y Gen. of U.S.*, 916 F.3d 276, 280, 286, 290 (3d Cir. 2019); *City of Chicago v. Barr* ("*City of Chicago I*"), 888 F.3d 272, 285–86 (7th Cir. 2018), *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (June 4, 2018); *Colorado v. U.S. Dep't of Justice*, No. 19-cv-00736, 2020 WL 1955474, at *2, *7–*8 (D. Colo. Apr. 23, 2020), *appeal docketed*, No. 20-1256; *Oregon*, 406 F. Supp. 3d at 950–51, 962 n.7, 963–65; *City of Evanston*, 412 F. Supp. 3d at 877, 882; *City & County of San Francisco*, 349 F. Supp. 3d at 935–36, 945.  None of these cases addresses the question presented here, *i.e.*, the extent of the Attorney General's authority under § 10157(b) to design competitive grant programs such as the CGIC Program.  Indeed, when judicial opinions regarding Byrne JAG formula grants mention § 10157(b) at all, they do so to *contrast* the Attorney General's broad discretion under that provision with what they view as his lack of authority to impose conditions on formula grants.  *See City of Chicago II*, 961 F.3d at 906; *City of Providence*, 954 F.3d at 28, 34; *City of Philadelphia*, 916 F.3d at 285–86; *Colorado*, 2020 WL 1955474 at *2, *21; *Oregon*, 406 F. Supp. 3d at 951, 965; *City & County of San Francisco*, 349 F. Supp. 3d at 945.  *Contra* Pl.'s Mot. at 10 (misapprehending the import of *City of Providence*'s discussion of § 10157(b)(1)).  Indeed, the same Ninth Circuit panel that held that the Department lacks statutory authority to impose the notice, access, and § 1373-compliance conditions on FY 2017 Byrne JAG grants also held that the Department has statutory authority to give preference to jurisdictions that

agree to abide by the notice and access conditions when awarding discretionary COPS grants.  *Compare City of Los Angeles v. Barr*, 941 F.3d 931, 942–44 (9th Cir. 2019) (Byrne JAG), *with City of Los Angeles*, 929 F.3d at 1177–81 (COPS).  Thus, the City fails to establish a likelihood of success on the merits of Counts One and Two because it merely references cases involving Byrne JAG formula grants without engaging with the *non-formula* nature of the CGIC Program and the distinct statutory provision under which the CGIC Program is authorized.

To be clear, the Department continues to maintain that it has the authority to include immigration-related conditions in Byrne JAG formula grants—and its myriad arguments in Byrne JAG cases also apply to the discretionary CGIC grant at issue here.  For example, Congress required all applicants for law-enforcement grants under title I of the Crime Control Act to certify that they "will comply with all provisions of [title I] and all other applicable Federal laws," 34 U.S.C. § 10153(a)(5)(D), and both this Administration and the prior Administration have determined that 8 U.S.C. § 1373 is "an applicable Federal law for purposes of" this certification.  *See* AR 384–85 (July 7, 2016 memo); AR 432 (October 6, 2016 guidance); AR 1033 (FY 2017 Byrne JAG formula grant § 1373-certification condition).  Congress also explicitly delegated to the Assistant Attorney General for OJP the authority to "plac[e] special conditions on all grants," and to "determin[e] priority purposes for formula grants," 34 U.S.C. § 10102(a)(6), and the AAG imposed the challenged conditions pursuant to this authority.[7]

Although a district court in this Circuit recently rejected these arguments, the Department has appealed that decision.  *See Colorado*, 2020 WL 1955474 at *9–*13, *appeal docketed*, No. 20-1256.  If the

---

[7] *See also*, *e.g.*, 28 U.S.C. § 530C(a) (except as provided otherwise by law, "the activities of the Department … may, in the reasonable discretion of the Attorney General, be carried out through any means"); 2 C.F.R. § 200.300(a) ("The Federal awarding agency must manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with U.S. statutory and public policy requirements….").

Tenth Circuit holds that the Department has authority to impose immigration-related conditions on Byrne JAG formula grants—as the Second Circuit recently did, *see New York*, 951 F.3d 84 at 104–111—it would almost certainly compel a ruling in Defendants' favor here. But even if the Tenth Circuit were to rule against the Department in *Colorado*, this Court should affirm the Department's authority to include the challenged conditions in CGIC awards based on the independent grant of authority in § 10157(b)(1). *See supra* pp. 21–25.

### B.    The Attorney General Did Not Violate the Administrative Procedure Act by Including the Challenged Conditions in FY 2018 CGIC Awards.

The Administrative Procedure Act instructs courts to "set aside agency action" that is "found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2). Judicial review under this standard is "highly deferential." *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1273 (10th Cir. 2013). "A presumption of validity attaches to the agency action and the burden of proof rests with the parties who challenge such action." *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012) (citation omitted). A reviewing court "may not substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and must "uphold the agency's action if it has articulated a rational basis for the decision and has considered relevant factors." *Cherokee Nation v. Bernhardt*, 936 F.3d 1142, 1153 (10th Cir. 2019) (citation omitted). APA review is particularly deferential where, as here, Congress delegates to an agency broad grantmaking authority. *See City of Los Angeles*, 929 F.3d at 1181–82 (explaining that the agency need provide only "a minimal level of analysis" in this context (citation omitted)); *cf. Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("[A]s long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, [the APA] gives the courts no leave to intrude.").

The City's motion comes nowhere close to demonstrating that the Department violated the APA. It requires only common sense to recognize the Federal Government's interest in ensuring that

programs or activities funded by discretionary law-enforcement grants comply with the information-sharing requirements described in 8 U.S.C. §§ 1373 and 1644, and that funded entities do not publicly disclose "federal law enforcement information in a direct or indirect attempt" to impede the enforcement of federal law, Award Letter at 20. This common-sense explanation is sufficient to demonstrate the "rational basis" required by the APA. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009); *City of Los Angeles*, 929 F.3d at 1181–82 (finding a similar explanation adequate to justify favoring jurisdictions that comply with the "notice" and "access" conditions in the discretionary COPS grant program).

Even if the APA required more, the administrative record amply supports the rationality of the Department's choice to include the challenged conditions in the FY 2018 CGIC grants. In 2016, the Department's Inspector General determined that many state and local recipients of federal law-enforcement funds were "imped[ing] information sharing with federal immigration officials," undermining the federal-state cooperation that Congress envisioned when it enacted 8 U.S.C. § 1373. AR 366–68; *see supra* pp. 7–9. In 2017, the Attorney General cited evidence of "more than 200 instances" in "a single week" of state and local jurisdictions refusing to share information regarding unlawfully present aliens "charged or convicted of a serious crime." AR 754. In some of these instances, information-sharing would likely have enabled federal officials to prevent a violent crime. *See id.* It was plainly rational for the Attorney General to respond to these facts by including the challenged conditions on discretionary law-enforcement grants in an effort to encourage jurisdictions "to change their policies that undermine public safety, and to partner with federal law enforcement to remove criminals." AR 1606. In addition, the administrative record contains evidence of an instance in which the mayor of a major U.S. city publicly disclosed an impending federal law-enforcement operation in an apparent attempt to hamper its effectiveness. AR 1038–39. It was plainly rational for the Attorney General to respond to this incident by including the non-disclosure requirement in

29

discretionary FY 2018 initiatives such as the CGIC Program.

The City's motion for a preliminary injunction fails to sustain any other conclusion. In particular, the motion's APA argument (at page 29) contains several "'naked assertions' devoid of 'further factual enhancement,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). These conclusory assertions do not come close to satisfying the City's burden to show that the Department's presumptively valid action was arbitrary or capricious. *See Hillsdale*, 702 F.3d at 1165. Nor does the City's contention that it is already in compliance with the conditions "rais[e] questions about Defendants' insistence on appending them to the CGIC Grant," Pl.'s Mot. at 13. The City cites no authority for its contention that the Department had to consider the individual circumstances of potential grantees before including the challenged conditions on *all* FY 2018 CGIC grants, *see id.* at 29, and no such authority exists. If anything, the City's insistence that its existing policies likely comply with the conditions illustrates the irrationality of *the City's* decision to refuse to accept its CGIC award and instead bring this lawsuit over a year later.[8]

### C.   The Challenged Conditions Do Not Violate the Tenth Amendment.

Next, the City contends that the Department may not impose the information-sharing and non-obligation requirements because 8 U.S.C. §§ 1373 and 1644 "violate the Tenth Amendment." Pl.'s Mot. at 27–28. This argument is a red herring; the constitutionality of those statutes is not at issue here. The challenged requirements do not enforce *any* statute against grant recipients; they

---

[8] Notably, the City's motion is internally inconsistent as to the potential consequences of complying with the challenged conditions. In one section of its motion, the City asserts that its existing, "immigrant-friendly" policies already comply with the conditions, describing the conditions as "largely inapplicable to the City" because it does not "own[] or operat[e] a jail, correctional facility, or detention facility." Pl.'s Mot. at 13–14. Elsewhere, however, the City claims that the conditions "force local law enforcement to . . . act as arms of ICE," *id.* at 2–3, and that "complying with the . . . conditions would usurp local control of City officers, redistribute local decision-making to, and conscript the time of, local employees," would "result in harm to the trust between immigrant communities and APD[,] and would discourage individuals from reporting gun related crimes and cooperating with investigations," *id.* at 32–33. These conflicting assertions should be viewed with skepticism.

merely incorporate by reference some of the substantive concepts found in §§ 1373 and 1644.  *See* Award Letter at 18–19 (requiring grantees to certify that they will not "prohibit or in any way restrict— (1) any government entity or -official from sending or receiving information regarding citizenship or immigration status *as described in* 8 U.S.C. 1373(a)" (emphasis added)).  More fundamentally, this case does not present the question whether § 1373 or § 1644 violates the Tenth Amendment because the challenged requirements are not direct orders to the City but rather conditions placed on its use of federal funds (and have no application beyond the program or activity receiving those funds).

The Tenth Amendment anti-commandeering doctrine "simply represents the recognition" that "the Constitution confers on Congress . . . only certain enumerated powers" and "the power to issue direct orders to the governments of states" is not one of them.  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018).  Accordingly, the Supreme Court held in *Murphy* that Congress could not directly prohibit state legislatures from authorizing sports gambling.  *Id.* at 1478.  The Supreme Court has also invoked the Tenth Amendment in holding that Congress may not directly order states to regulate in a particular area, *see New York v. United States*, 505 U.S. 144, 161 (1992), or "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997).

It is well established, however, that "in exercising its spending power, Congress may offer funds to the States, and may condition those offers on compliance with specified conditions."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012).  Congress's enumerated power to spend money "gives the Federal Government considerable influence even in areas where it cannot directly regulate," as grant conditions "may well induce the States to adopt policies that the Federal Government itself could not impose."  *Id.* (citing *South Dakota v. Dole*, 483 U.S. 203, 205–06 (1987)).  The Tenth Amendment anti-commandeering doctrine simply is not implicated where, as here, the Federal Government offers money to a state or local jurisdiction on the condition that the state adopt, or

31

refrain from adopting, a particular policy.  *Id.*  Accordingly, this Court need not—and should not—consider whether §§ 1373 and 1644 would violate the Tenth Amendment if directly enforced against state and local governments.  *See United States v. House of Representatives of U.S.*, 556 F. Supp. 150, 152 (D.D.C. 1983) ("Courts have a duty to avoid unnecessarily deciding constitutional issues." (citing *United States v. Rumely*, 345 U.S. 41, 45–46 (1952)).  Instead, the relevant inquiry is whether the three challenged conditions are permissible under the Spending Clause.

### D.        The Challenged Conditions Do Not Violate the Spending Clause.

The City's motion for a preliminary injunction discusses Spending Clause principles in a cursory manner, and its arguments are easily refuted.  First, the City asserts that "if the Executive Branch wishes to condition the receipt of federal funds, it may *only* do so pursuant to a specific delegation of spending authority by Congress."  Pl.'s Mot. at 19 (quoting *Oregon*, 406 F. Supp. 3d at 961).  The City overlooks the fact that Congress *did* specifically delegate to the Attorney General the authority to decide whether—and, with few limitations, on what terms—to spend a pool of appropriated funds on discretionary programs such as the CGIC grant.  *See* 34 U.S.C. § 10157(b).  There is no basis whatsoever for the City's suggestion that this case involves "the Executive Branch . . . [asserting] unilateral authority to cancel appropriations passed by Congress," Pl.'s Mot. at 19.

The City's only other reference to the Spending Clause consists of a conclusory assertion that the conditions are impermissibly ambiguous.  *See* Pl.'s Mot. at 30.  The single paragraph that the City devotes to this point fails to offer any evidence, or meaningfully develop any argument, in support of this claim.  *See id.*; *see also Leathers v. Leathers*, 856 F.3d 729, 750 (10th Cir. 2017) (arguments that are inadequately briefed are waived).  The City had ample notice of that the CGIC award would include these conditions, and the FY 2018 CGIC award letter sets forth in considerable detail precisely what the three challenged conditions require.  *See* Award Letter at 18–20.  Moreover, to the extent any uncertainty might remain, the award letter invites recipients to contact OJP with "[a]ny questions

32

about the meaning or scope" of each condition the City challenges.  *Id.* at 18–19.  The City's failure to take advantage of this opportunity—and its analysis of whether its existing policies comply with the conditions, *see* Pl.'s Mot. at 13–14—undermines the City's conclusory assertion that it is unable to ascertain what the conditions require.

Accordingly, the City has not carried its heightened burden of showing a likelihood of success on the merits, *see Fort Collins*, 916 F.3d at 797, and its motion should be denied.

## III.    The Equities and the Public Interest Tilt Against Preliminary Injunctive Relief.

A party seeking a preliminary injunction must also "establish . . . that the balance of equities tips in [its] favor, and that [the] injunction is in the public interest." *Winter*, 555 U.S. at 20.  These factors merge when a plaintiff seeks an injunction against the Federal Government. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  As explained above, the City bears a "heavier burden" on the balance-of-harms factor than an ordinary plaintiff because the injunction it requests is *triply* disfavored: it would alter the status quo, mandate action by the Department, and afford the City all the relief it could recover at the conclusion of a full trial on the merits.  *See Fort Collins*, 916 F.3d at 797.

The public interest weighs heavily against the City's attempt to preliminarily enjoin a statutorily authorized Executive Branch policy.  Courts have routinely held that "the United States has an interest in enforcing federal law." *Acosta v. Idaho Falls Sch. Dist. No. 91*, 291 F. Supp. 3d 1162, 1168 (D. Idaho 2017) (*quoting United States v. E. Baton Rouge Parish Sch. Bd.*, 594 F.2d 56, 58 (5th Cir. 1979)).  The City's request for preliminary relief threatens, in particular, the "strong interest . . . in the effective and efficient enforcement of the nation's immigration laws," *Inland Empire-Immigrant Youth Collective v. Nielsen*, No. 17-cv-2048, 2018 WL 1061408, at *21 (C.D. Cal. Feb. 26, 2018), as well as the Federal Government's interest in seeing that federal funds are used "to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980).  Also, as discussed, the

33

challenged conditions are "part of accomplishing the Department of Justice's top priority of reducing violent crime." AR 1604 (Attorney General's press release); *see supra* pp. 7–11, 22–23, 29–30.

The City advances the contrary claim that the challenged conditions "would impair the effectiveness of the crime-fighting measures chosen by the City." Pl.'s Mot. at 35; *see id.* at 34. But the City offers no evidence in support of this assertion, which contradicts the City's separate argument that its existing policies comply with the conditions. *See supra* p. 30 n.8 (noting this contradiction). The City also suggests that it will be harmed by "[f]urther delay" in disbursing the grant, but it has no one to blame but itself for the lengthy delay in adjudicating the present dispute. *See supra* pp. 14–15, 19–20.

At bottom, compelling the Department to immediately disburse discretionary grant funds to a city that maintains it may use the funds to "hamper[] the enforcement of federal laws, or worse, violat[e] those laws" would be neither equitable nor in the public interest; to the contrary, it would be "disquieting." *New York*, 951 F.3d at 107. Accordingly, the City has not carried its heightened burden of demonstrating that the equities weigh in favor of issuing a triply-disfavored preliminary injunction.

## CONCLUSION

For the foregoing reasons, the City's motion for a preliminary injunction should be denied.

Dated:  August 7, 2020

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

/s/ *Joseph J. DeMott*
JOSEPH J. DEMOTT
Trial Attorney (Va. Bar No. 93981)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.

34

Washington, DC 20005
Tel: (202) 514-3367
Fax: (202) 616-8470
Email: joseph.demott@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2020, I electronically filed the foregoing paper with the Clerk

of Court using this Court's CM/ECF system, which will notify all counsel of record of such filing.

/s/ *Joseph J. DeMott*
JOSEPH J. DEMOTT
Trial Attorney (Va. Bar No. 93981)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 514-3367
Fax: (202) 616-8470
Email: Joseph.DeMott@usdoj.gov