IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CITY OF ALBUQUERQUE,

     Plaintiff,

vs.                                   Civ. No. 20-371 KG/KK

WILLIAM P. BARR,
In his official capacity as Attorney
General of the United States, and
the UNITED STATES DEPARTMENT
OF JUSTICE,

     Defendants.

## MEMORANDUM OPINION AND PRELIMINARY INJUNCTION ORDER

This is an administrative agency review case involving Defendants' award of an FY 2018 Crime Gun Intelligence Center Integration Initiative (CGIC) grant to Plaintiff, an immigrant friendly city, under the Edward Byrne Memorial Justice Assistance Grant (Byrne JAG) Program. Plaintiff complains that Defendants unlawfully imposed three conditions on the FY 2018 CGIC grant award related to the enforcement of immigration laws. *See* Verified Petition for Injunctive Relief, Declaratory Relief, and a Writ of Mandamus (Petition) (Doc. 1), filed April 22, 2020. The Court notes subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 2201(a), 28 U.S.C. § 1361, and 5 U.S.C. § 702.

On July 10, 2020, Plaintiff filed the instant "Plaintiff City of Albuquerque's Motion for Preliminary Injunction and Brief in Support" (Motion for Preliminary Injunction). (Doc. 13). The Motion for Preliminary Injunction now is fully and timely briefed. *See* (Docs. 16, 25, 28, and 29). Having considered the briefing, the controlling law, and for the following reasons, the Court grants the Motion for Preliminary Injunction.

*I.  Background*

*A. Plaintiff's Status as an Immigrant Friendly City*

In 2018, Plaintiff reaffirmed its status as an "Immigrant Friendly City," and resolved,

*inter alia*, that neither it nor "any third party on its behalf" shall inquire "or collect in any way

information regarding, the citizenship, immigration status, place of birth, religion, or national

origin, of any person," unless necessary under certain exceptions.  (Doc. 1-4) at 6-7.  Plaintiff

also resolved not to disclose any of the above information it possesses absent a "valid judicial

warrant … or as otherwise required by law."  *Id.* at 7.  Plaintiff further resolved not to use its

resources or to permit its facilities to enforce federal immigration laws, for example, by detaining

persons based on their immigration status or on a belief that the persons violated an immigration

law, or by honoring immigration detainers or federal administrative warrants "based solely on a

violation of federal immigration law…."  *Id.*  In addition, Plaintiff resolved to refuse access to

non-public areas of its property by "federal immigration agents who are requesting access for the

purpose of enforcing federal immigration law unless presented with a judicial warrant issued

specifically requiring such access."  *Id.*

Some of the reasons for these resolutions include Plaintiff's understanding that

"enforcement of federal civil immigration laws" by local governments "undermine[s] community

policing, hinder[s] a productive and trusting relationship with the immigrant community, and

divert[s] important public safety resources…."  *Id.* at 3.  More specifically, Plaintiff "wishes to

encourage immigrants to report crime and speak to the police without fear of being arrested or

reported to the United States Immigration and Customs Enforcement agency…."  *Id.* at 5.

*B. The Byrne JAG Program*

Under the Byrne JAG Program, the Attorney General may make grants to local governments "to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of " eight law enforcement related programs.[1]  34 U.S.C. § 10152(a)(1).  The Byrne JAG Program works "to give State and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution."  H.R. Rep. No. 109-233, at 89 (2005), *reprinted in* 2005 U.S.C.C.A.N. 1636, 1640.

The Byrne JAG Program authorizes two types of grants.  The first type of grant is formula based.  *See* 34 U.S.C. §§ 10152(a)(1) and 10156.  The second type of grant is a discretionary grant originating from reserved funds "for 1 or more of the purposes specified" above, which the Attorney General has determined "is necessary—(1) to combat, address, or otherwise respond to precipitous or extraordinary increases in crime, or in a type or types of crime…."  *See* 34 U.S.C. §§ 10157(b)(1).  The FY 2018 CGIC grant at issue comes from the Byrne JAG Program's reserved funds.  *See* (Doc. 1-8) at 5.

---

[1] Those eight programs are:

    (A) Law enforcement programs.
    (B) Prosecution and court programs.
    (C) Prevention and education programs.
    (D) Corrections and community corrections programs.
    (E) Drug treatment and enforcement programs.
    (F) Planning, evaluation, and technology improvement programs.
    (G) Crime victim and witness programs (other than compensation).
    (H) Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams.

34 U.S.C. § 10152(a)(1).

To apply for any grant under the Byrne JAG program, the chief executive officer of a city must submit an application to the Attorney General.  34 U.S.C. § 10153(A). That application must contain a certification that "the applicant will comply with all provisions of this part and all other applicable Federal laws."  34 U.S.C. § 10153(A)(5)(D).  Furthermore, the Assistant Attorney General for the Office of Justice Programs (OJP) has the power to "plac[e] special conditions on all grants…."  34 U.S.C. § 10102(a)(6).  Significantly, this power to place special conditions is the last of the Assistant Attorney General's enumerated powers.  Also, of note,

> [n]othing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof.

34 U.S.C. § 10228(a).

### C.  The FY 2018 CGIC Grant

According to the Department of Justice (DOJ), the purpose of the FY 2018 CGIC grant "is to encourage local jurisdictions to work with their [Alcohol, Tobacco, and Firearms] partners to utilize intelligence, technology, and community engagement to swiftly identify firearms used unlawfully and their sources, and effectively prosecute perpetrators engaged in violent crime." (Doc. 1-5) at 4.  "Awardees will work with ATF to implement CGIC business practices that include interagency collaboration focused on the immediate collection, management, and analysis of crime gun evidence such as shell casings and test fires of unlawfully used firearms recovered in real time to identify criminal shooters, disrupt criminal activity, and prevent future violence."  *Id.* at 5 (bolding omitted).  The FY 2018 CGIC grant announcement does not mention federal immigration laws.  Plaintiff applied for the FY 2018 CGIC grant in May 2018.  *See* (Doc. 1) at ¶ 42.

4

In August 2018 the OJP instructed its "authorized representative or point of contact" to alert FY 2018 CGIC grant applicants that DOJ planned to include additional requirements in the FY 2018 CGIC grant award documents.  (Doc. 10-9) at 11.  An "[o]verview of the additional requirements" stated that with regard to the funded "program or activity" the award recipient will

> be required not to engage in conduct that would violate the provisions of 8 U.S.C. §§ 1373 and 1644 (both of which deal with communications with the U.S. Department of Homeland Security of information regarding the citizenship and/or immigration status of individuals), and also not to engage in conduct that violates (or engage in conduct that aids or abets a violation of) 8 U.S.C. § 1324(a) (which, among other things, sets federal penalties for concealing, harboring, or shielding from detection certain aliens under certain circumstances).

*Id.*

> Section 1373 provides:

> **(a) In general**
> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.
> **(b) Additional authority of government entities**
> Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:
> **(1)** Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
> **(2)** Maintaining such information.
> **(3)** Exchanging such information with any other Federal, State, or local government entity.

Section 1644, similar to Section 1373, states:

> Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

Section 1324(a)(1)(A)(iii) and (v) make it a crime to knowingly "or in reckless disregard" either "conceal, harbor, or shield from detection" an illegal alien; conspire to do so; or to aid or abet in the commission of the above acts.

In a letter dated October 1, 2018, DOJ notified Plaintiff that it approved the application for the FY 2018 CGIC grant in the amount of $452,108.  (Doc. 1-8) at 1.  The letter included a separate grant award and Special Conditions document.  *Id.*  The letter further noted:  "Should you not adhere to these requirements, you will be in violation of the terms of this agreement and the award will be subject to termination for cause or other administrative action as appropriate." *Id.*  The enclosed grant award also specified that approval of the grant project is subject to the special conditions attached to the grant award.  *Id.* at 5.

At issue here are Special Conditions 49, 50, and 51.  Special Condition 49 states that with respect to a "program or activity" funded under the grant Plaintiff may not prohibit or restrict any government entity or official from communicating to the Immigration and Naturalization Service (INS) about the citizenship or immigration status of any individual, citing Sections 1373 and 1644.  *Id.* at 18.  Special Condition 50 states that Plaintiff may not obligate grant award funds if a "program or activity" funded under the grant is "subject to any 'information-communication restriction'" in violation of Sections 1373 and 1644.  *Id.* at 19.  Finally, Special Condition 51 states that with respect to a "program or activity" funded under the grant Plaintiff cannot publicly disclose sensitive federal law enforcement information to "conceal, harbor, or shield" illegal aliens, citing Section 1324.  *Id.* at 20.

On November 7, 2018, Plaintiff accepted the FY 2018 CGIC grant award, but marked out Special Conditions 49, 50, and 51. (Doc. 1-9) at 2, 15-17.  In a letter dated November 15, 2018, Plaintiff explained to DOJ why it does not agree with Special Conditions 49, 50, and 51, and

requested grant adjustments to remove those Special Conditions. (Doc. 1-10). Plaintiff relied, in part, on *City of Evanston v. Sessions*, in which the federal district court granted a nation-wide preliminary injunction against the application of similar conditions to Byrne JAG Program formula based grants awarded to members of the Conference of Mayors, of which Plaintiff is a member. *Id.* at 2; *see City of Evanston v. Sessions*, 2018 WL 10228461 (N.D. Ill.). On December 17, 2018, DOJ responded that Plaintiff had to resubmit the award acceptance for the FY 2018 CGIC grant "without any conditions marked out." (Doc. 1-11).

The next day, Plaintiff sent a letter to DOJ in which it again cited *City of Evanston* and noted that DOJ informed Plaintiff "that it will not enforce the immigration-related conditions attached to the 2017 Local and State Byrne JAG Program grants."[2] (Doc. 1-12); *see also* (Doc. 25-2). Plaintiff asked DOJ if it would agree not to enforce Special Conditions 49, 50, and 51 "unless and until a court of law rules that the Department of Justice can lawfully enforce these conditions[.]" (Doc. 1-12) at 1 (bolding omitted). Plaintiff requested a response by January 4, 2019. *Id.* at 2. Due to the subsequent federal government shutdown, Plaintiff later asked DOJ to respond to its inquiry by February 8, 2019. (Doc. 1-13).

On February 2, 2019, DOJ responded to Plaintiff. (Doc. 1-14). First, DOJ indicated that the *City of Evanston* preliminary injunction applied only to "certain specific conditions that are attached to the Fiscal Year 2017 Byrne JAG award to" Plaintiff. *Id.* at 1. Second, DOJ stated that it was unaware of a similar injunction applicable to the conditions attached to the FY 2018 CGIC grant award. *Id.* Consequently, DOJ intended to enforce all of the award conditions attached to the FY 2018 CGIC grant. *Id.*

---

[2] Those Byrne JAG Program grants are formula based and do not come from reserved funds, like GCIC grants.

In May 2019 Plaintiff informed DOJ again of its disagreement regarding the enforcement of Special Conditions 49, 50, and 51. (Doc. 25-6). Indeed, Plaintiff demanded that the Attorney General, through the OJP, issue the funds awarded for the FY 2018 CGIC grant. *Id.* at 4. The next action Plaintiff took was to file this lawsuit in April 2020. (Doc. 1).

## II. The Petition

Plaintiff brings the following five causes of action in its Petition: (1) an *ultra vires* cause of action; (2) a cause of action based on a separation of powers violation of the United States Constitution; (3) an Administrative Procedure Act (APA) cause of action; (4) a cause of action based on a violation of the spending clause of the United States Constitution; and (5) a cause of action based on a violation of the Tenth Amendment of the United States Constitution. Plaintiff seeks declaratory and injunctive relief as well as a writ of mandamus.

## III. The Motion for Preliminary Injunction

Plaintiff seeks a preliminary injunction to enjoin Defendants from (1) requiring compliance with Special Conditions 49, 50, and 51; (2) "withholding, terminating, or clawing back CGIC funding from [Plaintiff], or disbarring or making [Plaintiff] ineligible for the GCIC grant;" (3) "withholding, terminating, or clawing back CGIC funding from [Plaintiff]" if Plaintiff spends its own funds on CGIC projects that the FY 2018 CGIC grant "would have otherwise funded during the grant period if the funds had not been withheld;" and (4) enforcing Sections 1373 and 1644 as conditions under the FY 2018 CGIC grant award. (Doc. 13) at 36.

Plaintiff further seeks a preliminary injunction that compels "Defendants to immediately release the CGIC award funds to [Plaintiff], to revise the CGIC grant to remove special

conditions 49, 50, and 51, and to extend the grant project and budget periods to three years from the date the funds are released to [Plaintiff]."[3]  *Id.*

Defendant opposes the Motion for Preliminary Injunction in its entirety.

### IV.  The Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019).  "A party may be granted a preliminary injunction only when monetary or other traditional legal remedies are inadequate, and 'the right to relief is clear and unequivocal.'"  *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (citation omitted).  The Tenth Circuit has held that

> a party seeking a preliminary injunction . . . must demonstrate (1) that it has a substantial likelihood of prevailing on the merits; (2) that it will suffer irreparable harm unless the preliminary injunction is issued; (3) that the threatened injury outweighs the harm the preliminary injunction might cause the opposing party; and (4) that the preliminary injunction if issued will not adversely affect the public interest.

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001).  "District courts have discretion over whether to grant preliminary injunctions…."  *Free the Nipple–Fort Collins*, 916 F.3d at 796 (citation omitted).

Evens so, "courts 'disfavor' some preliminary injunctions and so require more of the parties who request them."  *Free the Nipple–Fort Collins*, 916 F.3d at 797 (citation omitted). "Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial."  *Id.*  Rather, "a disfavored injunction may exhibit any of three characteristics: (1) it

---

[3] Plaintiff also initially sought declaratory relief in the Motion for Preliminary Injunction.  *See* (Doc. 13) at 36 (seeking "a declaration that CGIC Grant conditions 49, 50, and 51 are unlawful").  Plaintiff, however, does not pursue this preliminary injunction relief in its reply. *See* (Doc. 29) at 12-13.  The Court, therefore, concludes that Plaintiff no longer seeks declaratory relief in its Motion for Preliminary Injunction.

mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Id.*  "To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make a strong showing that these tilt in her favor." *Id.* (quotations omitted).

In this case, Defendants argue that Plaintiff's requested preliminary injunction exhibits all three characteristics of a disfavored injunction and that the heavier burden, therefore, applies to Plaintiff.  Plaintiff disagrees.

    A.  *Mandating Action*

A mandatory preliminary injunction compels a defendant "to do something it was not already doing during the last uncontested period preceding the injunction." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001).  More specifically, the Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result ... place [s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1261 (10th Cir. 2005) (citation omitted).

Indeed, Plaintiff requests preliminary injunction relief to compel Defendants to release the FY 2018 CGIC grant funds, remove Special Conditions 49, 50, and 51 from the grant award, and to extend the grant project and budget periods.  Such a request requires Defendants to affirmatively act in a particular way.  Plaintiff, however, argues that it does not request any supervision from the Court.  The Court disagrees with Plaintiff.  Should the Court grant the Motion for Preliminary Injunction in its entirety and order Defendants to release the FY 2018

CGIC grant funds, the Court would necessarily have to supervise Defendants to ensure they do not attempt to claw back the grant funds at a later date.

The Court, therefore, concludes that Plaintiff seeks a mandatory preliminary injunction, a disfavored preliminary injunction necessitating that Plaintiff show that the likelihood-of-success-on-the-merits and the balance-of-harms factors strongly favor a preliminary injunction.

### B. Changing Status Quo

"[T]he status quo is 'the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing.'" *Dominion Video Satellite, Inc.*, 269 F.3d at 1155 (citation omitted). To determine "the status quo for preliminary injunctions, … court[s] look[] to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights" or to "the last status immediately before the filing for injunctive relief." *Id.*

Plaintiff concedes that "the last uncontested status was that the grant award had been made to [Plaintiff]…." (Doc. 29) at 4. Nevertheless, Plaintiff argues that "an order that DOJ simply follow through with the distribution is not an order that would alter the status quo." *Id.* Yet, the controversy in this case occurred because Defendants conditioned the distribution of funds on Plaintiff's compliance with Special Conditions 49, 50, and 51. A preliminary injunction ordering the release of the FY 2018 CGIC grant funds without requiring compliance with Special Conditions 49, 50, and 51 necessarily changes the status quo: the existence of a FY 2018 CGIC grant award requiring compliance with Special Conditions 49, 50, and 51.

Hence, the Court concludes that Plaintiff seeks a preliminary injunction that changes the status quo. Such a disfavored preliminary injunction, likewise, places a heavier burden on

Plaintiff to demonstrate that the likelihood-of-success-on-the-merits and the balance-of-harms factors strongly favor a preliminary injunction.

> C.  *Granting All the Relief in a Preliminary Injunction that Plaintiff Would Expect After Prevailing at Trial*

Another disfavored preliminary injunction occurs when "the preliminary injunction affords [the plaintiff] substantially all the relief which it might be entitled after a full trial on the merits."  *Dominion Video Satellite, Inc.*, 269 F.3d at 1155.  Plaintiff argues that the preliminary injunction it seeks does not constitute such a disfavored preliminary injunction because the Petition, unlike the Motion for Preliminary Injunction, additionally asks the Court to (1) "resolve legal and constitutional issues that would determine what conditions the DOJ could and could not impose on federal grants in the future," i.e., to grant declaratory relief; and (2) award attorney fees and costs.  (Doc. 29) at 4.

As noted *supra* at footnote 3, Plaintiff no longer seeks declaratory relief in its Motion for Preliminary Injunction.  Consequently, a preliminary injunction would not grant all the relief Plaintiff would expect after prevailing at trial, including declaratory relief. [4]  Plaintiff, thus, does not seek the third type of disfavored preliminary injunction.

V.  *Discussion*

> A.  *Irreparable Harm*

"'[B]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate

---

[4] The Court notes that it recently rejected a plaintiff's argument "that a preliminary injunction would not afford it all of its requested relief, because it requests attorney's fees in the Complaint, and a preliminary injunction would not award costs or fees."  *Legacy Church, Inc. v. Kunkel*, 2020 WL 3963764, at *73 (D.N.M.).  The Court explained that attorney's fees and costs "are incidental to the injunction as they would not exist on their own without the injunction request." *Id.*

that such injury is likely before the other requirements' will be considered."  *DTC Energy Grp., Inc.*, 912 F.3d at 1270 (citation omitted).  In fact, "[t]he purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance."  *Id.* (citation omitted).

"To show a threat of irreparable harm, a plaintiff must demonstrate 'a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'" *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016) (citation omitted).  Also, irreparable harm "occurs if 'the district court cannot remedy [the injury] following a final determination on the merits.'"  *Id.* (citation omitted).  The Tenth Circuit has "held that irreparable harm 'does not readily lend itself to definition,' … and is 'not an easy burden to fulfill' …."  *Id.* at 751-52 (citations omitted).

Plaintiff argues that "the harm is not the temporary loss of funds, it is the constitutional injury and the inability to carry out the violent-crime-reducing, law enforcement activities, which Defendants have already determined are of sufficient importance to merit the award of a Byrne JAG CGIC grant."  (Doc. 29) at 10.  Plaintiff specifically argues that "Defendants' refusal to release the grant funds has already delayed implementation of the CGIC program."  (Doc. 13) at 32.  In addition, Plaintiff asserts that the Hobson's choice it faces, having to choose between harming its trust relationship with the immigrant community or declining needed grant funds that would aid in the deterrence of crime, amounts to irreparable harm.

First, Plaintiff's constitutional injury argument fails.  The Tenth Circuit recently stated that its "cases finding that a violation of a constitutional right alone constitutes irreparable harm are limited to cases involving individual rights, not the allocation of powers among the branches of government."  *Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir.), *reh'g en banc granted,*

*judgment vacated on other grounds,* 973 F.3d 1151 (10th Cir. 2020).  In this instance, Plaintiff

alleges violations of the Constitution premised on *ultra vires*, separation of powers, spending

clause, and Tenth Amendment causes of action.  Those alleged constitutional violations clearly

do not involve the violation of individual rights under the Constitution but, instead, concern

alleged constitutional violations based on "the allocation of powers among the branches of

government."  *See id.*  As the Tenth Circuit instructs, such alleged constitutional violations do

not automatically create an irreparable harm.

   With respect to Plaintiff's second irreparable harm argument, that Defendants' refusal to

release the FY 2018 CGIC grant funds has delayed implementation of the CGIC program,

Defendants note that the Petition's prayer for relief requests that the Court "[e]njoin Defendants

from withholding, terminating, or clawing back the CGIC funds on account of [Plaintiff]

expending its own funds to accomplish activities pursuant to the CGIC grant that the improperly

withheld CGIC funds would have covered…."  (Doc. 1) at 34.  Defendants, therefore, suggest

that the pendency of this lawsuit will not necessarily deter the FY 2018 CGIC grant activities

from moving ahead since Plaintiff envisions spending its own funds on those grant activities.

Even if Plaintiff expends its own funds in the future to implement the FY 2018 CGIC grant

activities, the implementation of those grant activities still would have been delayed.  Such a

delay in implementing the grant activities hinders, or even thwarts, law enforcement efforts to

deter crime during that time period, an irreparable harm that money damages cannot compensate.

   In addition, other courts have accepted Plaintiff's Hobson's choice argument for

establishing irreparable harm.  For instance, in *City of Chicago v. Sessions*, the City, like

Plaintiff, acknowledged that

   in the absence of an injunction, it must either forego the Byrne JAG grant funds it has
   specifically earmarked for life-saving technology that detects when and where gunshots

> are fired … or accede to the new conditions the Attorney General has placed on the funds and suffer the collapse of trust between local law enforcement and immigrant communities that is essential to ferreting out crime.

*City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 949 (N.D. Ill. 2017), *aff'd,* 888 F.3d 272 (7th Cir. 2018), *reh'g en banc granted in part, opinion vacated in part on other grounds,* 2018 WL 4268817 (7th Cir.), *vacated on other grounds*, 2018 WL 4268814 (7th Cir.).  The court found that "[o]nce such trust is lost, it cannot be repaired through an award of money damages, making it the type of harm that is especially hard to 'rectif[y] by [a] final judgment.'"  *Id.* at 950 (citation omitted).  Thus, the court concluded that "[t]he harm to the City's relationship with the immigrant community if it should accede to the conditions is irreparable."  *Id.* (noting that "'Hobson's choice' can establish irreparable harm") (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)).  *In accord, City of Los Angeles v. Sessions,* 2018 WL 6071072, at *3 (C.D. Cal.), *aff'd sub nom. City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019) (finding irreparable harm when City "is faced with an impossible choice: either it must certify compliance with unconstitutional and unlawful directives that impinge on the City's sovereignty, damage community trust, and harm public safety, or it will lose congressionally authorized Byrne JAG funding") (citing *City of Chicago,* 264 F. Supp. 3d at 950); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017) (finding irreparable harm when City "is faced with a 'Hobson's Choice' between, on the one hand, complying with a law it credibly believes is unconstitutional, and on the other hand, foregoing funds it plans to use for life-saving projects") (citing *City of Chicago,* 264 F. Supp. 3d at 950-51).  The Court agrees with the reasoning in *City of Chicago* and the other like cases.  Hence, the Hobson's choice faced by Plaintiff also constitutes irreparable harm.

Nevertheless, Defendants argue that Plaintiff's "lengthy delay in moving for a preliminary injunction" belies Plaintiff's "assertion that the grant funds are urgently needed to combat gun crime…." (Doc. 25) at 28. Defendants note that in February 2019 they made clear to Plaintiff that they would not release the FY 2018 CGIC grant funds without Special Conditions 49, 50, and 51. Even so, Plaintiff did not file this lawsuit until April 2020, more than a year later, and did not file the Motion for Preliminary Injunction until August 2020.

Plaintiff explains the delay in filing the lawsuit on its decision to await favorable decisions in other courts on similar issues so as to obviate the need for a lawsuit. Once Plaintiff filed its lawsuit, Plaintiff maintains that Defendants' counsel "repeatedly asked" Plaintiff not to request a preliminary injunction. (Doc. 29) at 12. Plaintiff also amended the Motion for Preliminary Injunction several times to address court decisions that were issued in April 2020 and June 2020.

Although "delay in seeking preliminary relief cuts against finding irreparable injury," in the Tenth Circuit, "delay is but one factor in the irreparable harm analysis…." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) (citations omitted). "The question …is whether the delay was reasonable, was not a decision by the party to 'sit on its rights,' and did not prejudice the opposing party." *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016) (citation omitted). Here, the delay seems reasonable considering the pending court cases addressing issues similar to the ones presented in this lawsuit. Plaintiff, therefore, did not "sit on its rights." *See id.* Moreover, Defendants do not specify how the delay in filing the Motion for Preliminary Injunction has prejudiced them. The failure to demonstrate prejudice "alone is sufficient for [the court] to reject [a] delay rationale." *Id.*

To summarize, Plaintiff has clearly and unequivocally shown it will suffer irreparable harm absent a preliminary injunction by virtue of the delay in implementing the FY 2018 CGIC grant activities and the Hobson's choice it necessarily faces in this case.

### B. Likelihood of Success on the Merits

"Although '[t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success,' … '[a]ll courts agree that plaintiff must present a prima facie case but need not show a certainty of winning.'" *Coal. of Concerned Citizens to Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of Transportation*, 843 F.3d 886, 901 (10th Cir. 2016) (citation omitted). The Court initially addresses whether Plaintiff has made a strong showing that it will likely succeed on the merits of its *ultra vires* cause of action.  The pertinent question for determining an *ultra vires* cause of action is "whether the agency has gone beyond what Congress has permitted it to do…."  *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 298 (2013).

Section 10157(b) of the Byrne JAG Program contains the following relevant restrictions on the Attorney General's discretion and authority to create a CGIC reserve funded grant: the funds must be "for 1 or more of the purposes specified in section 10152" in order "to combat, address, or otherwise respond to precipitous or extraordinary increases in crime, or in a type or types of crime…."  34 U.S.C. § 10157(b)(1).  Section 10152(a)(1), in turn, states that the purpose of Byrne JAG Program grants is "to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice" for eight kinds of programs, including "[l]aw enforcement programs."

Without referring to the above statutory provisions, Plaintiff argues first that the Attorney General's discretion and authority to impose special conditions is limited by the specific purpose of the FY 2018 CGIC grant, "to address firearm-related crime and forensics," and that Special

Conditions 49, 50, and 51 do not relate to that purpose.  (Doc. 13) at 10.  Consequently, Plaintiff concludes that the Attorney General exceeded his discretion and authority by imposing Special Conditions 49, 50, and 51.  Plaintiff does not support this conclusion with any legal citation or support.

Defendants counter that Special Conditions 49, 50, and 51 "serve a 'criminal justice' (and 'law enforcement') purpose within the meaning of § 10152(a)(1)."  (Doc. 25) at 31.  Indeed, the United States Supreme Court has recognized that "[w]hile 'it is not a crime for a removable alien to remain present in the United States,' … in some jurisdictions, such as Arizona's 'most populous county,' aliens who have entered the country illegally 'are reported to be responsible for a disproportionate share of serious crime.'" *City of Los Angeles v. Barr*, 929 F.3d 1163, 1178 (9th Cir. 2019) (quoting *Arizona v. United States*, 567 U.S. 387, 397–98, 407 (2012)); *see also Demore v. Kim*, 538 U.S. 510, 518 (2003) (noting that Congress has expressed concern about "increasing rates of criminal activity by aliens").  Defendants also argue that Special Conditions 49, 50, and 51 relate to "technical assistance[] and information systems," additional grant purposes listed in Section 10152(a)(1).  Considering the plain language of Sections 10157(b) and 10152(a)(1) as well as the precedent recognizing some association between illegal aliens and crime, the Court rejects Plaintiff's first *ultra vires* argument as proposing an overly narrow interpretation of the Attorney General's discretion and authority under Sections 10157(b) and

10152(a)(1).[5]

Next, Plaintiff argues that Defendants exceeded their lawful authority when they imposed Special Conditions 49, 50, and 51 because doing so violates Section 10228.  Section 10228 prohibits the federal government from "exercise[ing] any direction, supervision, or control over any [local] police force…."  In construing Section 10228's predecessor statute, the Fourth Circuit observed that Congress intended "to guard against any tendency towards federalization of local police and law enforcement agencies." *Ely v. Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971) (construing statute to prohibit federal authorities from "[prescribing] the type of shoes and uniforms to be worn by local law enforcement officers, the type or brand of ammunition to be purchased and used by police departments and many other vital matters pertaining to the day-to-day operations of local law enforcement" (citation omitted)).  Since 1971, both the Seventh and Third Circuits have addressed Section 10228 in the context of Byrne JAG Program conditions based on Section 1373, the immigration provision supporting Special Conditions 49 and 50.  "Section 1373 declares that a state or local government may not prohibit or restrict its own

---

[5] The Court notes that Defendants further cite Section 10152(a)(2).  Section 10152(a)(2) states that Section 10152(a)(1) "shall be construed to ensure that a grant" can also be used for any purpose under the previous Edward Byrne Memorial Grant Program and Local Enforcement Block Grant Program that existed prior to 2006.  Defendants specifically cite 42 U.S.C. § 3753(a)(11) (2002) which required the following from a grant applicant:

> An assurance that the State has established a plan under which the State will provide without fee to the Immigration and Naturalization Service, within 30 days of the date of their conviction, notice of conviction of aliens who have been convicted of violating the criminal laws of the State and under which the State will provide the Service with the certified record of such a conviction within 30 days of the date of a request by the Service for such record.

Defendants argue that this application requirement reflects a grant purpose "that promotes federal-state cooperation in immigration enforcement…."  (Doc. 25) at 33.

officials from communicating information regarding the citizenship or immigration status of any individual to the INS." *City of Chicago v. Barr* (*Chicago II*), 961 F.3d 882, 909 (7th Cir. 2020).

In *Chicago II*, the Seventh Circuit held that "[t]hrough § 1373, the Attorney General seeks to prohibit the state or political subdivision from providing certain instructions and limitations on the actions of its own police force, thus exercising 'direction, supervision, or control' over that police force." *Id.* at 908.  In *City of Philadelphia v. Attorney General of United States*, the Third Circuit, like the Seventh Circuit, held that "Section 1373 would authorize the [DOJ] to direct, supervise, or control Philadelphia Police communications with ICE" in contravention of Section 10228.  916 F.3d 276, 291 (3d Cir. 2019), *reh'g denied* (June 24, 2019).  *But see State of New York v. Dep't of Justice*, 951 F.3d 84, 108–09 (2d Cir. 2020) (holding that "Section 1373 … does not direct, control, or supervise the day-to-day operations of any State or local police force or law enforcement agency" because "[i]t does not mandate that State or local law enforcement authorities cooperate with federal immigration officers," i.e., "[i]t requires only that nothing be done to prohibit voluntary communication about citizenship or immigration status among such officials").  Considering that two of the above three circuit courts have determined that Section 1373, and by analogy Section 1644, violate Section 10228, Plaintiff has made a strong showing that it would likely succeed on the merits of its *ultra vires* cause of action premised on a violation of Section 10228.  *See Chicago II*, 961 F.3d at 909 (finding that "parties concede that § 1644 is identical to § 1373").

Furthermore, Plaintiff cites *Chicago II* to support its *ultra vires* cause of action because the Seventh Circuit "rejected every one of the AG's proffered bases of authority…."  (Doc. 13) at 16.  The Court notes that in addressing the *ultra vires* issue, the Seventh Circuit in *Chicago II* also addressed separation of powers and spending clause issues.

20

One of Defendants' proffered bases of authority which the Seventh Circuit addressed is Section 10102(a)(6), which provides the OJP Assistant Attorney General with the authority to "plac[e] special conditions on all grants…."  34 U.S.C. § 10102(a)(6).  *Chicago II* admittedly concerned a Byrne JAG formula based grant and the Seventh Circuit acknowledged that interpreting Section 10102(a)(6) to "authorize the wholesale denial of all grant funds would be a radical departure from the otherwise carefully-delineated rules for the awarding and the withholding of [formula based] funds."  The Seventh Circuit, nonetheless, noted it had previously stated in *Chicago I* that

> '[a] clause in a catch-all provision at the end of a list of explicit powers would be an odd place indeed to put a sweeping power to impose *any* conditions on *any* grants—a power much more significant than all of the duties and powers that precede it in the listing, and a power granted to the Assistant Attorney General that was not granted to the Attorney General.' ... As the Supreme Court has repeatedly held, 'Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.'

*Chicago II*, 961 F.3d at 894 (citations omitted) (also stating that "plain language of § 10102(a)(6) precludes an interpretation that it is a stand-alone grant of power unrelated to the authority granted in the chapter or the authority granted to the Attorney General").  This rationale for rejecting Section 10102(a)(6) as a source of authority for imposing immigration related conditions on Byrne JAG grants, generally, certainly applies to the FY 2018 CGIC reserve funded grant at issue here.

Moreover, the Seventh Circuit in *Chicago II* addressed and rejected Defendants' argument that Section 10153(A)(5)(D) provides authority for imposing Special Conditions 49, 50, and 51.  Under Section 10153(A)(5)(D), Plaintiff, as a grant applicant, must certify that it will comply with "all other applicable Federal laws," which, according to Defendants, necessarily includes federal immigration laws like Sections 1373, 1644, and 1324(a), the bases

for Special Conditions 49, 50, and 51.  While the Seventh Circuit directed some of its discussion

regarding Section 10153(A)(5)(D) specifically to the Byrne JAG Program formula based grants,

other parts of its discussion pertain to all Byrne JAG Program grants.

For example, the Seventh Circuit held that "[t]he most natural reading of the last

provision [of Section 10153(A)(5)(D) is that 'all other applicable' laws refers to the many

federal laws that apply specifically to grants or grantees." *Chicago II*, 961 F.3d at 899. "If

Congress meant to incorporate all law that applies to States or localities, that would be

accomplished by requiring compliance with 'all federal law.'" *Id.*  The Seventh Circuit observed

that

> [i]nterpreting that language as potentially incorporating any federal law would vest the
> Attorney General with the power to deprive state or local governments of a wide variety
> of grants, based on those entities' failure to comply with whatever federal law the
> Attorney General deems critical. Yet there is nothing in those statutes that even hints that
> Congress intended to make those grants dependent on the Attorney General's whim as to
> which laws to apply, cabined only by the requirement that the laws apply generally to
> states or localities. That anomalous result is avoided if we interpret the term "all other
> applicable federal law" to incorporate federal laws that explicitly apply to grants or grant
> recipients. As to those federal laws, Congress clearly intended them to apply to states and
> local governments applying for federal grants, and to impact those grants.

*Id.* at 905.

In addition, the Seventh Circuit noted that it previously observed in *Chicago I* that "[i]n

the past few years" Congress failed to pass

> numerous pieces of legislation … seeking to condition federal funding on compliance
> with 8 U.S.C. § 1373-which was intended to address "sanctuary cities" and prohibit
> federal, state or local government officials or entities from restricting the exchange of
> information with the immigration authorities regarding citizenship or immigration status.

*Id.* 902-03 (citation omitted).  The Seventh Circuit held that "[t]he Attorney General's reading

[of Section 10153(A)(5)(D)] would … allow the Executive Branch to override Congress' refusal

to endorse § 1373 compliance and would effectively 'legislate' a different result," a separation of powers violation.  *Id.* at 903.

Also, the Seventh Circuit held that "the term 'applicable' by itself is so devoid of any definition or guidance that, if the Attorney General were relying on that provision as a delegation of authority to impose the conditions, it would vest discretion unmoored by any legislative general policy or boundaries of authority."  *Id.* at 907.  "An interpretation of 'other applicable federal laws' that is limited to laws that expressly apply to grantees is clearly ascertainable, in contrast to the broader interpretation of the Attorney General which is unbounded—which would literally include thousands of federal statutes and regulations."  *Id.* at 907-908.

The Seventh Circuit further held that "Congress, under its spending power, can attach only conditions that 'bear some relationship to the purpose of the federal spending,' and the universe of *all* federal laws as promoted by the Attorney General would necessarily include many laws that fail to meet that standard—once again rendering the conditions ambiguous."  *Id.* at 908.  Finally, the Seventh Circuit held that Sections 1373 and 1644 are not considered "applicable federal law," because they conflict with Section 10228.[6]  *Id.* at 908-09.

---

[6] The Seventh Circuit concluded that "[t]he federal government cannot merely conscript the police forces of the state or local governments to achieve its ends; that would eviscerate the principles of federalism that rest at the very foundation of our government."  *Chicago II,* 961 F.3d at 892.  Additionally, the Seventh Circuit concluded that "[t]he Attorney General's use of extra-statutory conditions on federal grant awards as a tool to obtain compliance with his policy objectives strikes at the heart of another core value, which is the separation of powers among the branches of the federal government."  *Id.*  Furthermore, the Seventh Circuit concluded that "[t]he authority to pass laws and the power of the purse rest in the legislative not the executive branch."  *Id.*

Applying the relevant reasoning in *Chicago II* to this case, Plaintiff has more than demonstrated that Defendants have "gone beyond what Congress has permitted [them] to do…."[7] *See City of Arlington, Tex.*, 569 U.S. at 298.  Plaintiff, therefore, has made a clear and unequivocal *prima facie* case for an *ultra vires* cause of action.  Consequently, the Court concludes that Plaintiff has made a strong showing that it is likely to succeed on the merits of its *ultra vires* cause of action, if not also on its separation of powers and spending clause causes of action.  Given this conclusion, the Court need not address Plaintiff's other likelihood-of-success-on-the-merits arguments concerning its other causes of action, like the APA and Tenth Amendment causes of action.[8]

### C.  Balance of Harms and Public Interest

The Court notes that the last two preliminary injunction factors, the balance of harms and the affect on public interest, "'merge' when, like here, the government is the opposing party." *Aposhian*, 958 F.3d at 978 (citation omitted).  Defendants contend that they have a strong interest in enforcing immigration laws and in furthering executive policy goals of reducing violent crime by conditioning federal grants on compliance with immigration laws.  The Court does not dispute that Defendants have a strong interest in enforcing immigration laws and in reducing violent crime.  Even so, Defendants will suffer only minimal harm if they distribute the FY 2018

---

[7] The Court notes that it declines to follow the minority position in *State of New York*. *See* 951 F.3d 84.  As the Seventh Circuit in *Chicago II* observed, the Second Circuit is "the only circuit— of … five … to uphold the challenged [immigration] conditions" stemming from "the Attorney General's frustration that cities "can 'simultaneously accept federal law enforcement grants, yet maintain local policies that frustrate federal immigration enforcement." 961 F.3d at 887 (citation omitted).

[8] Plaintiff also relies on the preliminary injunction issued by the *City of Evanston* to support its likelihood-of-success-on-the-merits and the preliminary injunction, generally.  The Court, however, finds the reasoning from the Seventh Circuit in *Chicago II*, a case decided after *City of Evanston,* to have more persuasive value.  Consequently, the Court need not discuss *City of Evanston*.

CGIC grant funds without Special Conditions 49, 50, and 51.  In fact, distribution of those funds

to implement the FY 2018 CGIC grant activities will help to achieve Defendants' goal of

reducing violent crimes.  Moreover, the Court notes that "even objecting governments such as

[Plaintiff] willingly cooperate with federal authorities as to those individuals who commit serious

offenses." *Chicago I*, 888 F.3d 272, 291 (7th Cir. 2018), *reh'g en banc granted in part, opinion*

*vacated in part on other grounds,* 2018 WL 4268817 (7th Cir.), *vacated on other grounds,* 2018

WL 4268814 (7th Cir.).  Finally, if Defendants ultimately prevail in this lawsuit, they may seek

to recoup the expended funds from Plaintiff.

On the other hand, the impact on Plaintiff if it accepts Special Conditions 49, 50, and 51

"could be devastating." *Id.*  Accepting those Special Conditions will destroy Plaintiff's trust

relationship with the immigration community and adversely impact Plaintiff's ability to reduce

crime.  "Such trust, once destroyed by the mandated cooperation and communication with the

federal immigration authorities, would not easily be restored." *Id.*

If Plaintiff does not accept Special Conditions 49, 50, and 51, it will also be significantly

harmed either by having to expend its own funds to pursue the FY 2018 CGIC grant activities,

or, if Plaintiff chooses not to expend its own funds, by foregoing law enforcement assistance

intended "to combat, address, or otherwise respond to precipitous or extraordinary increases in

crime, or in a type or types of crime…." *See* 34 U.S.C. § 10157(b)(1).

The Court concludes that the harm Plaintiff will suffer without a preliminary injunction

substantially outweighs the harm Defendants will suffer if the Court issues a preliminary

injunction.  Therefore, Plaintiff has clearly and unequivocally demonstrated that the balance-of-

harms factor strongly favors a preliminary injunction.

Finally, the Court determines that enjoining what are likely unlawful Special Conditions promulgated by the executive branch to encroach on congressional legislative power will serve the public interest. *See City of Chicago v. Barr,* 405 F. Supp. 3d 748, 769 (N.D. Ill. 2019), *aff'd and remanded,* 957 F.3d 772 (7th Cir. 2020), *opinion amended and superseded,* 961 F.3d 882 (7th Cir. 2020), *and aff'd and remanded*, 961 F.3d 882 (7th Cir. 2020) (finding that "[e]njoining the unlawful conditions and checking the Executive's encroachment of congressional power undoubtedly serves the public interest").  Hence, Plaintiff has clearly and unequivocally shown this last factor favors a preliminary injunction as well.

 *D. Conclusion*

 For the above reasons, the Court concludes that Plaintiff has clearly and unequivocally satisfied all four requirements for a preliminary injunction, including for a disfavored preliminary injunction.  The Court, therefore, exercises its discretion to grant the Motion for Preliminary Injunction.

 IT IS ORDERED that

 1.  Plaintiff City of Albuquerque's Motion for Preliminary Injunction and Brief in Support (Doc. 13) is granted; and

 2.  Defendants are enjoined from:

  a.  requiring compliance with Special Conditions 49, 50, and 51 of the FY 2018 CGIC grant;

  b.  withholding, terminating, or clawing back FY 2018 CGIC grant funding from Plaintiff, or disbarring or making Plaintiff ineligible for the FY 2018 CGIC grant;

  c.  withholding, terminating, or clawing back FY 2018 CGIC grant funding from Plaintiff on account of Plaintiff spending its own money on the CGIC program that the

FY 2018 CGIC grant award would have otherwise funded during the grant period if the funds had not been withheld; and

        d. enforcing Section 1373 and Section 1644's statutory obligations against Plaintiff as FY 2018 CGIC grant conditions; and

    3. Defendants must (a) immediately release the FY 2018 CGIC grant funds to Plaintiff; and (b) revise the FY 2018 CGIC grant award to remove Special Conditions 49, 50, and 51, and to extend the grant project and budget periods to three years from the date the funds are released to Plaintiff.

                              UNITED STATES DISTRICT JUDGE